[No. B168079. Second Dist., Div. Eight. Nov. 22, 2005.]

LEE EDDINS et al., Plaintiffs and Appellants, v.
SUMNER REDSTONE et al., Defendants and Respondents.

292

## Counsel

Fairbank & Vincent, Robert H. Fairbank, Dirk L. Vincent; Greines, Martin, Stein & Richland, Kent L. Richland, Barbara W. Ravitz and Edward L. Xanders for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Deputy Attorney General, Thomas Greene, Chief Assistant Attorney General, Kathleen Foote, Assistant Attorney General, Barbara Motz and Patricia L. Nagler, Deputy Attorneys General, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Simpson Thacher & Bartlett, Kenneth R. Logan, Kyle A. Lonergan and Seth Ribner for Defendants and Respondents Sumner Redstone, Viacom Inc., and Paramount Home Entertainment, Inc.

Hogan & Hartson, Richard L. Stone and Poopak Nourafchan for Defendant and Respondent Twentieth Century Fox Home Entertainment, Inc.

Munger, Tolles & Olson, Glenn D. Pomerantz, David C. Dinielli and Paul J. Watford for Defendant and Respondent Universal Studios Home Video LLC.

Heller Ehrman, Robert G. Badal and Edward J. Slizewski for Defendant and Respondent Buena Vista Home Entertainment, Inc.

Gibson, Dunn & Crutcher, Scott A. Edelman and Christopher D. Dusseault for Defendant and Respondent Columbia TriStar Home Entertainment, Inc.

Vinson & Elkins, Robert C. Walters, Stacey H. Doré; Simpson Thacher & Bartlett and Seth A. Ribner for Defendant and Respondent Blockbuster Inc.

OPINION

**BOLAND, J.—**

## SUMMARY

More than 250 independent video retailers sued Blockbuster Inc., its parent company Viacom Inc., Viacom's controlling shareholder, Sumner Redstone, and the home-video affiliates of five major Hollywood movie studios, alleging antitrust and price discrimination violations under California law. The complaint centers upon output revenue-sharing agreements between the movie studios and Blockbuster, under which Blockbuster purchases video cassettes of the studios' movies for rental to consumers. Under the agreements, Blockbuster purchases the videotapes at a low initial price, in exchange for a portion of the rental revenues and a long-term commitment by Blockbuster to purchase the entire output of movies from the studios. The plaintiffs do not challenge the agreements between Blockbuster and the studios. Instead, they allege Blockbuster and the studios conspired with each other to deny the same favorable terms and conditions to distributors for independent retailers. They also allege violations of the Unfair Practices Act—which forbids secret rebates, unearned discounts, and the secret extension of special privileges not available to all purchasers who buy on like terms and conditions—and the unfair competition law.

We affirm the trial court's summary adjudication in favor of Blockbuster and the studios on the plaintiffs' conspiracy claim under the Cartwright Act. We reverse the court's summary adjudication of plaintiffs' claims for violation of the Unfair Practices Act and the unfair competition law, except with

respect to intra-enterprise transactions between Blockbuster and its sister company. Specifically, we conclude that:

—Summary adjudication of the plaintiffs' conspiracy claims is required under *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*), because "all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply unlawful conspiracy only as likely as permissible competition or even less likely," so that "a reasonable trier of fact could not find for the plaintiff." (*Id.* at p. 857, italics and fn. omitted.)

—The trial court erred in concluding, as a matter of law, that the Unfair Practices Act does not apply to the different prices the studios are alleged to have charged to plaintiffs' distributors and to Blockbuster. Specifically:

> —A plaintiff need not purchase on "like terms and conditions" in order to state an actionable claim that a competitor has received a secret rebate or unearned discount.

> —Material questions of disputed fact exist as to whether the allegedly unearned discounts the studios gave Blockbuster were "secret" as required by the statute. The fact that the "general parameters" of Blockbuster's revenue-sharing agreements with the studios were widely reported in the media does not establish lack of secrecy as a matter of law, because other evidence indicated that several key economic factors in the agreements were not known to plaintiffs or to the general public.

> —The "functional classification" defense, which permits a supplier to charge different prices to buyers in different functional classifications, such as wholesalers (the distributors) and retailers (Blockbuster), was improperly applied in this case. Blockbuster did not perform any function justifying a differential in price.

> —The trial court failed to consider evidence of harm to competition in the secondary line of commerce, between Blockbuster and its competitors, and therefore erred in finding that two studios established, as a matter of law, a "meeting competition" defense to plaintiffs' Business and Professions Code, section 17045 claim.

> —The trial court correctly concluded that, because Blockbuster and its sister company Paramount are commonly controlled, they are part of a single economic enterprise, and transactions between

them cannot form the basis for a Business and Professions Code, section 17045 violation.

—Because it was error to grant summary judgment of the claims under the Unfair Practices Act, it was also error to grant summary judgment on the cause of action for violation of the unfair competition law. (Bus. & Prof. Code, § 17200 et seq.)

## FACTUAL AND PROCEDURAL BACKGROUND

This action seeks treble damages, disgorgement and injunctive relief for violations of the Cartwright Act, the Unfair Practices Act and the unfair competition law. The suit was brought as a class action by Lee Eddins, doing business as Video Empire, and 250 other independent video rental retailers (collectively, Eddins) against Blockbuster Inc., the nation's largest video rental retailer; Viacom Inc., Blockbuster's majority shareholder; Sumner Redstone, Viacom's controlling shareholder; and the home-video affiliates of five major Hollywood movie studios (studio defendants or studios), which distribute videocassettes of feature motion pictures to video retailers for rental to the public.[1]

Eddins's lawsuit alleges that, beginning in late 1997, Blockbuster and the studios conspired with each other to deny independent retailers the same favorable terms and conditions the studios provided to Blockbuster. The studios provided the favorable terms under long-term output revenue-sharing agreements the studios entered into with Blockbuster in 1997 and 1998. The studios, by allegedly denying the same terms to distributors that serve the independent retailers, fixed the prices charged to the independent retailers at an artificially high level. The suit also alleges the agreement among Blockbuster and the studios resulted in discriminatory pricing that was detrimental to the independent retailers competing with Blockbuster. Defendants moved for summary judgment, and the trial court granted their motion.

We first describe the background of the home video industry when the pertinent events occurred. We then explain the background of this case and court decisions in related litigation, and finally turn to the proceedings in this case.

### 1. *General industry background.*

The studio defendants sell videos directly to large chain-store retailers, including Blockbuster, that rent them to consumers. The studios also sell

---

[1] The five studio defendants are Paramount, Disney, Columbia TriStar, Universal, and Twentieth Century Fox. Three others (Warner, a Warner affiliate, and MGM) settled with plaintiffs and were dismissed from the case in May 2002.

videos to distributors, that resell them to independent retailers, including Eddins and the other plaintiffs, who rent them to consumers. In 1997, when the events precipitating this lawsuit began, Blockbuster was the nation's largest single home-video rental retailer, with 24 percent of the national market. The independent retailers, comprised of small chains and single-store owners, accounted for about 55 percent of the market.

Until late 1997, the studios employed two options for purchasing rental videos. Retailers and distributors could purchase videos at a stated price, approximately $65 per tape, a method referred to as "traditional sales." Alternatively, they could participate in a "cherry-pick" revenue-sharing plan offered through Rentrak, one of the approximately 10 distributors in the industry. Under "cherry-pick" revenue sharing, studios sold tapes for a low up-front fee plus a percentage of retailers' revenues from tape rentals, and the retailer selected the specific videos to purchase. Neither the traditional sales nor the cherry-pick revenue-sharing pricing models enabled retailers—whether large chains such as Blockbuster or independent retailers such as Eddins—to stock sufficient copies of "new release" titles to satisfy customer demand when it was highest, immediately after the video release of a movie. The lack of "copy depth" on newly released videos resulted in customer frustration over their inability to rent the newly released movies they most wished to see. As a consequence, the home-video market was languishing by 1997 as customers left video stores without renting a video.

Blockbuster was also languishing in 1997. According to Sumner Redstone, Blockbuster was "tanking" and the independent "moms and pops" were "outcompeting" Blockbuster. Blockbuster, however, developed an innovative concept for achieving copy depth on new releases, satisfying customer demand, and regaining its customers. Blockbuster proposed long-term, output-revenue-sharing agreements to each studio. Under the agreements, Block-buster would obtain a significantly greater number of copies of new studio releases, paying the studio a low up-front fee for each tape—a few dollars, compared to the $65 price for traditional sales. Blockbuster would commit to taking the studio's entire motion picture output, irrespective of the movie's box office performance. However, the number of tapes of each movie Blockbuster would be required to purchase varied according to the movie's box office performance. Blockbuster would share its rental revenues, and sometimes other fees, with the studio, and would provide various minimum guarantees to the studio. The aim was to achieve a 60/40 revenue split with each studio, with the studio receiving 40 percent of Blockbuster's rental revenue.[2] Blockbuster would guarantee the studio the same revenue stream Blockbuster

---

[2] The studios' 40 percent share was a lower percentage than the studios received in their cherry-pick revenue sharing on selected titles with distributor Rentrak.

paid under the traditional pricing model.[3] Under Blockbuster's revenue-sharing model, Blockbuster would receive more tapes for the same money it paid under traditional pricing. By virtue of Blockbuster's minimum guarantee, the studio would receive at least the revenues received under the traditional pricing model. The studio would share in the upside, if the additional copies generated increased rentals and increased revenues.

Over the course of a year, Blockbuster persuaded every major studio to enter into output revenue-sharing agreements, beginning with Disney on November 21, 1997 and ending with Fox on November 10, 1998. Blockbuster's new revenue-sharing model, with its copy depth advantage, worked extremely well, and Blockbuster's market share grew from 24 percent in 1997 to 27 percent in 1998, and to about 40 percent by 2001.[4] Although other large chains obtained the same type of output revenue-sharing arrangements as Blockbuster, Blockbuster's success came at the expense of smaller chains and independents who were unable to compete. According to one studio, the industry saw a net loss of more than 5,000 independent stores during 1998 and 1999; one distributor estimated that independents were closing at a rate of 300 to 400 stores per month as of November 1998. Eventually, some independent retailers sued, alleging price discrimination and antitrust violations.

### 2. *The Texas litigation.*

In July 1999, an independent retailer in Texas filed a class action lawsuit in federal district court against Viacom and six Hollywood studios, alleging violations of sections 1 and 2 of the Sherman Act (conspiracy in restraint of trade, attempted monopolization, and conspiracy to monopolize). The third amended complaint included Blockbuster as a defendant and asserted claims for restraint of trade and concerted refusal to deal under the Sherman Act. It also asserted violations of California law (the Cartwright Act, the Unfair Practices Act, and the unfair competition law).

On January 17, 2001, the Texas plaintiffs sought to withdraw their class certification motion to the extent their claims arose under California law, and moved to dismiss those claims without prejudice. On January 31, 2001 they filed this lawsuit in California on the class's behalf. The federal district court in Texas subsequently refused to allow plaintiffs to dismiss their California claims, finding the motion was brought in bad faith and would subject

---

[3] Blockbuster spent $50 million testing copy depth in selected cities and learned that a substantial increase in copy depth could generate an increase in rentals.

[4] It is undisputed that the different revenue-sharing programs Blockbuster negotiated with the studios were business-justified, commercial arrangements entered into by the parties acting in their perceived economic self-interest.

defendants to undue prejudice. A few days later, the Texas court denied plaintiffs' motion for class certification.

In May 2002 the Texas district court denied a defense motion for summary judgment. However, in June 2002, after 10 days of trial and at the conclusion of plaintiffs' case-in-chief, the court granted a motion by Blockbuster and the studios for judgment as a matter of law. It found "there is no legally sufficient evidence for a reasonable jury to find for the plaintiffs on all claims and there is simply no evidence that presents a sufficient conflict in substantial evidence to create a jury issue." In a separate order denying injunctive relief, the court stated that no evidence indicated a conspiracy to exclude independent video retailers from Blockbuster-type deals, and instead the evidence showed that independent video retailers like the plaintiffs could not participate in similar deals because of the output nature of the Blockbuster deals.

The Fifth Circuit Court of Appeals, reviewing the trial court's ruling de novo, affirmed the judgment. The court observed there was "almost no evidence whatsoever, circumstantial or otherwise, that the studios engaged in any direct communication during their respective negotiations with Blockbuster or that any studio agreed, at Blockbuster's request, not to make output revenue-sharing terms available to independents." (*Cleveland v. Viacom Inc.* (5th Cir., 2003) 73 Fed.Appx. 736, 740 [2003 U.S.App.Lexis 17717, 2003-2 Trade Cas.(CCH) ¶ 74,125].) The court also found plaintiffs did not present significant probative evidence that the studios' parallel conduct—in allegedly refusing to deal with the independents on similar terms—was contrary to their economic self-interest.[5]

### 3. *The California litigation.*

Meanwhile, Eddins and the other plaintiffs in the California lawsuit moved for class certification. The motion was denied in January 2002.[6] After Eddins filed a third amended complaint, Blockbuster and the studio defendants filed a motion for summary judgment. In addition to declarations from executives at Blockbuster, Viacom and each of the studios, the defendants supported their motion with deposition testimony and dozens of other exhibits, and lodged a

---

[5] The request of the studio defendants to take judicial notice of the Fifth Circuit's unpublished opinion in *Cleveland v. Viacom Inc., supra,* 73 Fed.Appx. 736, is granted. We also grant Eddins's motion for judicial notice of several other documents filed in *Cleveland v. Viacom Inc.,* including the plaintiffs' petition for rehearing and the Fifth Circuit's denial of the petition.

[6] The plaintiffs sought class certification only with respect to the price fixing claim, asserting that the alleged price fixing conduct was a per se violation of both the Cartwright Act and the unfair competition law. This court deferred consideration of the appeal plaintiffs filed from the trial court's ruling denying class certification, and that appeal will become moot upon the finality of this decision.

condensed copy of the transcript of the 10-day Texas trial for use in connection with their motion. Eddins opposed the motion, filing hundreds of exhibits as well as excerpts from depositions and Texas trial testimony. The details of the evidence will be discussed as necessary in conjunction with our resolution of the legal issues.

The trial court held a day-long hearing, and on February 20, 2003 granted the defendants' motion for summary judgment. Citing *Aguilar, supra,* 25 Cal.4th 826, the court concluded that, taken as a whole, Eddins's evidence did not point to conspiracy as more likely than permissible competition. The court also rejected the claim that the defendants' conduct violated the Unfair Practices Act and the unfair competition law.[7] Judgment was entered on April 17, 2003, and this appeal followed.

## DISCUSSION

### I. *Summary judgment was proper on Eddins's vertical and horizontal conspiracy claims under the Cartwright Act.*

Eddins contends that substantial evidence before the trial court showed that Blockbuster obtained favored deals from the major Hollywood studios and successfully asked them to deny comparable terms to independent video retailers. According to Eddins, the evidence supports (1) a horizontal conspiracy, orchestrated by Blockbuster, in which the studios agreed with each other to refuse to give distributors for independent video retailers the same output revenue-sharing terms they provided to Blockbuster, and (2) a series of vertical conspiracies to the same effect between Blockbuster and each studio. Before turning to the evidence, we first discuss the applicable law in ruling on a summary judgment motion in an antitrust action for unlawful conspiracy.

### A. *Aguilar established the principles to be applied to a motion for summary judgment in an antitrust conspiracy action.*

In *Aguilar*, the Supreme Court clarified the applicable law in ruling on motions for summary judgment, both generally and particularly in an antitrust action for unlawful conspiracy. Accordingly, the following points are not subject to debate:

—Blockbuster and the studios bear the burden of persuasion of their entitlement to judgment as a matter of law, namely, that Eddins cannot establish an agreement to deny the Blockbuster terms to independent retailers.

---

[7] Blockbuster and the studio defendants also sought summary judgment on res judicata and collateral estoppel grounds. The trial court rejected these grounds, finding that, while the claims were the same as those litigated to finality in the Texas action, privity did not exist between the California plaintiffs and the Texas plaintiffs. The defendants do not challenge the trial court's ruling on this issue.

—As the parties moving for summary judgment, Blockbuster and the studio defendants were required to make a prima facie showing of the nonexistence of any triable issue of material fact. In this case, the defendants were required to show that the studios did not agree among themselves, or individually with Blockbuster, to deny distributors the output revenue-sharing terms being provided to Blockbuster. The defendants carried this burden of production with declarations from Sumner Redstone (Viacom's controlling shareholder), John Antioco (Blockbuster's chief executive officer), and the studio executives responsible for the negotiations that led to their output revenue-sharing agreements with Blockbuster. Eddins does not dispute that Blockbuster and the studios made this prima facie showing.[8]

—Since the defendants made their prima facie showing, Eddins was required to produce evidence constituting a prima facie showing sufficient to support his claim of a conspiracy to deny Blockbuster terms to independent retailers. Specifically:

> —Eddins was required to present evidence "that would allow a reasonable trier of fact to find in his favor on the unlawful-conspiracy issue by a preponderance of the evidence, that is, to find an unlawful conspiracy more likely than not." (*Aguilar, supra*, 25 Cal.4th at p. 852.)

> —"Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow such a trier of fact so to find." (*Aguilar, supra*, 25 Cal.4th at p. 852, fn. omitted.) *Aguilar* tells us this result is compelled by antitrust law, including the Cartwright Act. Otherwise, procompetitive conduct, "the very thing that [antitrust law] is designed to protect," might be effectively chilled by subjecting it to undue costs in the judicial sphere. (*Aguilar, supra*, 25 Cal.4th at p. 852.)

---

[8] The studio executives described, for example, the background in the industry and the negotiations with Blockbuster, often protracted and difficult, as the studios sought to ensure they would derive at least as much revenue as under traditional pricing. Each executive asserted his or her studio acted independently and at no time conferred or agreed with any other studio about the terms of its deal, and did not agree with Blockbuster or each other to deny comparable terms to wholesale distributors. They also asserted their belief that distributors and small retailers generally were not interested in output revenue sharing because they did not want to commit to purchase all the studio's titles; described their various dealings with distributors and independent retailers to expand "cherry-pick" revenue sharing; and described the other programs they devised to achieve copy depth for independent retailers who could not or did not wish to participate in long-term output revenue sharing.

—"Therefore, in addition, [Eddins] must present evidence that tends to exclude, although it need not actually exclude, the possibility that [Blockbuster and the studios] acted independently rather than collusively."[9] (*Aguilar, supra,* 25 Cal.4th at p. 852.)

—*Aguilar* summarized its extensive discussion of summary judgment law as follows: "To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: If a party moving for summary judgment in any action, including an antitrust action for unlawful conspiracy, would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment." (*Aguilar, supra,* 25 Cal.4th at p. 855.)

Bearing these principles in mind, we turn to Eddins's theory of the case and the evidence he claims meets plaintiffs' burden to present "evidence that tends to exclude . . . the possibility that the alleged conspirators acted independently rather than collusively," so that a reasonable fact finder could find an unlawful conspiracy to deny comparable output revenue-sharing terms to independent retailers "more likely than not." (*Aguilar, supra,* 25 Cal.4th at p. 852.) We take up the parties' differing interpretations of the law as announced in *Aguilar* (pt. I.C, *post*) after reviewing the pertinent evidence.

> B. *Eddins's evidence does not allow a reasonable trier of fact to infer the existence of a horizontal conspiracy among the studios orchestrated by Blockbuster, because none of the evidence "tends to exclude . . . the possibility" that the studios acted independently rather than collusively.*

Eddins contends the evidence showed that Blockbuster obtained favored deals from the major studios in an effort to reverse a devastating competitive slide. Using coercion (threatened and actual purchase reductions) and enticement (increased revenues and supracompetitive pricing), Blockbuster persuaded the studios to agree among themselves to deny the independent retailers Blockbuster's favored terms. Offering no direct evidence of conspiracy, Eddins relies on the theory of conscious parallelism to prove an illegal agreement among the studios.

Conscious parallelism is a pattern of uniform business conduct, not in itself unlawful. (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* (1993) 509 U.S. 209, 227 [125 L.Ed.2d 168, 113 S.Ct. 2578] (*Brooke*

---

[9] An assertion that the trier of fact might disbelieve any denial of an unlawful conspiracy by Blockbuster and the studios is not sufficient. (*Aguilar, supra,* 25 Cal.4th at p. 852.)

*Group*).) To establish consciously parallel behavior, Eddins "must show (1) that the defendants' business behavior was parallel, and (2) that the defendants were conscious of each other's conduct and that their awareness was an element in their decisional process."[10] (*Schoenkopf v. Brown & Williamson Tobacco Corp.* (3d Cir. 1980) 637 F.2d 205, 208 (*Schoenkopf*).) Evidence of conscious parallelism alone, however, does not permit an inference of conspiracy " 'unless the plaintiff [either] establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest,' [citation] or offers other 'plus factors' tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade." (*City of Tuscaloosa v. Harcros Chemicals, Inc.* (11th Cir. 1998) 158 F.3d 548, 570–571, fns. omitted (*City of Tuscaloosa*); see 6 Areeda Antitrust Law (2002) ch. 14, ¶ 1434a.) As one commentator explains: " 'Even the fact that competitors have knowingly charged identical prices is a neutral fact in the absence of evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made.' " (Turner, *The Definition of Agreement Under the Sherman Act: "Conscious Parallelism" and Refusals to Deal* (1962) 75 Harv. L.Rev. 655, 659, quoted in *City of Tuscaloosa, supra*, 158 F.3d at p. 571.)

Thus, Eddins must show: (1) the defendants' business behavior was parallel; (2) each studio's awareness of the others' conduct in not offering output revenue-sharing terms to independent retailers was an element in its own decision not to do so; and (3) the failure to offer such terms to distributors for independent retailers was " 'contrary to their economic self-interest so as not to amount to a good faith business judgment.' " (*Royal Drug Co. v. Group Life And Health Ins. Co.* (5th Cir. 1984) 737 F.2d 1433, 1437 (*Royal Drug*), quoting *Pan-Islamic Trade Corp. v. Exxon Corp.* (5th Cir. 1980) 632 F.2d 539, 559.) Many courts refer generally to the third element as a requirement to "show the existence of certain 'plus' factors, including: (1) actions contrary to the defendants' economic interests, and (2) a motivation to enter into such an agreement." (*Petruzzi's IGA v. Darling-Delaware* (3rd Cir. 1993) 998 F.2d 1224, 1242 (*Petruzzi's IGA*).)[11]

---

[10] "Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." (*Brooke Group, supra*, 509 U.S. at p. 227.)

[11] In addition to acts against self-interest, another "plus factor" is evidence implying a traditional conspiracy—"conspiratorial opportunity, unexplained meetings, furtive behavior, discussions and information exchanges, ambiguous participant admissions, solicitations of agreement, sham bids, threats of common action directed against a potential victim, identical bids, refusals to bid, proved conspiracy or competition in other markets or times, or other

The circumstantial evidence from which a conspiracy can be inferred, according to Eddins, may be summarized as follows:

—None of the studios agreed to output revenue sharing with any distributor on Blockbuster-comparable terms.

—Each studio knew the other studios were not entering into output revenue-sharing agreements with distributors on Blockbuster-comparable terms.

—Each studio acted contrary to its individual economic interest in not agreeing to output revenue sharing with distributors, because:

> —Each studio increased its revenues under its agreements with Blockbuster (an undisputed point); and

> —It is in a studio's best interest to agree to comparable terms with distributors, in order to accomplish the same thing—increase its revenues—with as many independent retailers as possible.

> —Further, it is contrary to a studio's best interest to create market power in its largest buyer, but the studios knowingly did so, and collusion provides the only explanation for creating market power in one's largest buyer.

—In addition, the reasons each studio provided for failing to offer the Blockbuster terms to distributors were pretextual. The studio executives stated they offered other types of copy depth programs and other forms of revenue sharing, rather than the Blockbuster terms, because the distributors and independents did not want the Blockbuster terms, or did not request those terms. According to Eddins, these statements by the studios are contradicted by evidence that distributors and independent retailers asked the studios for the Blockbuster terms, and that all but the very smallest independents could and would do output revenue sharing.

Eddins's evidence founders at a number of points. Viewed as a whole, Eddins's evidence does not tend to exclude the possibility that the studios acted independently. Accordingly, under *Aguilar*, a reasonable juror could not find that an unlawful agreement to deny the Blockbuster terms to distributors

---

parallelism that is too close for coincidence and beyond explanation by mere recognized interdependence." (6 Areeda, Antitrust Law, *supra*, ch. 14, ¶ 1434b.) Except for evidence that the studios were generally aware of the terms of the other studios' deals with Blockbuster and distributors—information they obtained from their customers, not from each other—there is no evidence remotely similar to any of these types in this case.

was more likely than not. (*Aguilar, supra*, 25 Cal.4th at p. 852.) We review the evidence on each of the points necessary to Eddins's claim.

1. *Consciously parallel conduct: Eddins's evidence does not show or suggest that any studio's conduct in not offering output revenue-sharing terms to distributors was an element in any other studio's decision not to do so.*

The five studio defendants did not enter into output revenue-sharing arrangements with distributors, at least until April 2000.[12] The studios' conduct was the same, and the studios were aware generally of their competitors' practices. However, to establish consciously parallel conduct, Eddins must also show, as he concedes, that "their awareness was an element in their decisional process." (*Schoenkopf, supra*, 637 F.2d at p. 208.) Eddins failed to produce any evidence on this point. In other words, the evidence does not indicate that, for example, Fox's awareness that the other studios were not making output revenue-sharing contracts with distributors played any part in its own decisions on contracts with distributors. By contrast, the evidence shows (and defendants admit) that Fox's awareness that its competitors were making deals with Blockbuster was a factor in its decision to negotiate a deal with Blockbuster. That, however, is not the parallel conduct at issue. Not a single item of circumstantial evidence exists to suggest that one studio's failure to offer output revenue-sharing terms to distributors was a factor in any other studio's decision not to offer such terms to distributors.

Eddins's brief contends the evidence "amply shows otherwise," and the studios' files "overflow with price verifications and copies of each others' confidential contracts and pricing data." The "overflow[ing]" studio files show only that the studios received information from Blockbuster and distributors about their competitors' practices.[13] However, "the mere possession of a competitor's price-related documents, even with evidence of parallel

---

[12] In April 2000, Fox and Rentrak (the distributor which had "cherry-pick" revenue-sharing agreements with the studios for independent retailers since 1992) made a deal that included an output revenue-sharing option, and in March 2001, Universal and Rentrak did so. The Fox and Universal agreements with Rentrak did not require the independent retailer to commit to purchase a studio's output on a long-term basis; the term in each case was one year.

[13] The "overflow[ing]" studio files cited in Eddins's brief include: (1) evidence Blockbuster informed each studio about the deals it proposed to or obtained from other studios; (2) several documents showing the studios knew the general terms of each others' deals with distributors; (3) the studios' admissions that they routinely obtained, through retailers and distributors, each other's current pricing and contract terms; and (4) the presence in Fox files of a copy of the Blockbuster/Disney agreement and a Fox analysis of the Disney deal. The second category includes (a) a January 26, 1998 memo from Warner's files on Blockbuster's revenue-sharing proposal—predating Warner's own agreement with Blockbuster—which compares Warner's current and Disney's proposed revenue-sharing options through distributors; (b) a Fox document showing the terms of Disney deals and proposed deals with two distributors, Blockbuster, and Hollywood; and (c) a February 1998 Disney presentation to wholesalers, found in

pricing, has been held not to give rise to an inference of a price-fixing agreement. " (*In re Medical X-Ray Film Antitrust Litigation* (E.D.N.Y. 1996) 946 F.Supp. 209, 218, citing cases; see *Aguilar, supra,* 25 Cal.4th at pp. 862, 863 ["evidence concerning the gathering and dissemination of . . . pricing information . . . [did] not even imply collusive, rather than independent, action"; while such information can be misused as a basis for an unlawful conspiracy, the evidence must suggest such misuse].) Eddins cites *Alakayak v. British Columbia Packers, Ltd.* (Alaska 2002) 48 P.3d 432 (*Alakayak*) for the principle that "the evidence of price verifications tends to show that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making processes." (*Id.* at p. 456.) This assertion misconstrues *Alakayak,* because the court's statement was specifically addressed to the evidence in that case. The court went on to show not only that all defendants in that case engaged in price verifications, but that there was "evidence that the [defendants'] knowledge of each other's prices was an element in their decision-making." (*Ibid.*) The court described testimony from one defendant's representative on the point, and further indicated that "[o]ther testimony also tends to show that [defendants] used the price verifications in their decision-making." (*Ibid.*) By contrast, and as the trial court correctly concluded, Eddins offered no evidence "tending to show that any defendant actually *relied* upon its awareness of the other defendants' conduct in making its revenue-sharing decisions."

In short, the critical element establishing conscious parallelism is entirely absent. It may well be that the pricing information in a studio's files constitutes "verification" that the other studios' deals with distributors were different from their deals with Blockbuster. Even so, there is no indication that this knowledge of deal terms was in any way an element in any studio's decision not to offer output revenue sharing to distributors for independent retailers.

 2. *Acts against self-interest and motive for the alleged conspiracy: Eddins's evidence does not show that any studio acted in contradiction to its individual economic interest, or that the studios had a motive to conspire with each other to deny the Blockbuster terms to distributors for independent retailers.*

█ Even if consciously parallel behavior could be inferred from the presence of pricing information in studio files, more is required to permit an inference of conspiracy. As noted above, "before such an inference may be

Universal's files, including a page describing Disney's proposed distributor revenue-sharing deal terms. None of this evidence suggests consciously parallel determinations not to offer Blockbuster-comparable terms to distributors for independent retailers.

drawn a plaintiff must also show (1) that the defendants acted in contradiction of their economic interests, and (2) that the defendants had a motive to enter into an agreement." (*Schoenkopf, supra*, 637 F.2d at p. 208.) As stated in *Royal Drug*, to avoid summary judgment on this theory, Eddins must present "significant probative evidence" that the studios did not act independently. (*Royal Drug, supra*, 737 F.2d at p. 1437.)

> a. *Actions contrary to self-interest: Eddins's evidence of acts by the studios contrary to economic self-interest is insufficient to permit an inference of conspiracy.*

Eddins contends there is evidence that each studio acted contrary to its own economic self-interest when it failed to offer the Blockbuster terms to distributors. The evidence cited in Eddins's separate statement of undisputed facts falls into two categories, the first of which is premised on the undisputed point that, under their Blockbuster deals, the studios increased their revenues:

—Testimony from studio executives and the studios' economic expert, Professor Benjamin Klein, to the effect that the more output revenue-sharing agreements a studio has, the better, as the studio's goal is to maximize revenue.

—Evidence that (a) the studios knew that output revenue-sharing agreements would give Blockbuster a competitive advantage, allowing it to increase its market share at the expense of independent retailers, and (b) under fundamental economic principles, business firms are harmed by actions that create market power in their largest buyer, and collusion is the only explanation for creating market power in one's largest buyer.

We discuss each category in turn.

> i. *Increasing revenues: Eddins produced no probative evidence that the studios would have increased revenues by offering the Blockbuster terms to distributors.*

According to Eddins, we may infer that each studio acted against its own economic self-interest in failing to offer the Blockbuster terms to distributors. The inference is permissible because each studio increased its revenues under its agreement with Blockbuster, and therefore also could have increased revenues by offering the same terms to distributors. Eddins asserts the failure to do so is against economic self-interest. Eddins's argument is based on

testimony from three studio executives, and the studios' own economic expert, which merely acknowledges an economic truism.[14] The truism is that the greater the number of successful Blockbuster-like output contracts the studio has, the better it is for the studio. To conclude this is evidence of acts against self-interest requires the simplistic assumption that output revenue-sharing contracts with distributors serving independent retailers must necessarily produce an increase in revenues, just as Blockbuster's did, and ignores the significant differences between small retailers served by distributors and large chains. As an example, large chains with nationwide locations, such as Blockbuster, can "allocate inventory against competition." That is, large chains can satisfy customer preferences, which vary demographically, by placing different movie genres in the store locations where they are more likely to be rented. Single-store owners cannot do that. Likewise, single-store owners may have space limitations that impede their ability to effectively handle a studio's entire output of movie releases. And smaller retailers may be reluctant to enter into multiyear contracts to purchase a studio's entire output of movies.

In short, Eddins's evidence consists of the abstract proposition that more output revenue-sharing contracts equals more studio revenue, without regard to the host of differences that might affect the success of such contracts in generating increased revenues. It is simply unreasonable to infer, from Eddins's evidence, that output revenue-sharing contracts with distributors for independent retailers would have been successful, and that the studios therefore acted against their economic interests by not promptly offering contracts to distributors for independent retailers.

> ii. *Blockbuster's market power: The studios'*
> *knowledge of Blockbuster's increasing market*
> *power and competitive advantage, standing alone,*
> *does not permit an inference of conspiracy.*

We may also conclude each studio acted against its own self-interest, and therefore infer a conspiracy, Eddins contends, because the studios knew Blockbuster would gain a competitive advantage from output revenue sharing, and creating market power in one's largest customer is harmful. Several

---

[14] The testimony from studio executives relied upon by Eddins includes, for example, Columbia's Robin Russell replying affirmatively to the question, "Would you have loved to have all of these independent dealers committed to take all of your output?" Disney's Michael Johnson and Universal's Craig Kornblau gave testimony to the same effect. The studios' economic expert, Professor Klein, was asked if it was in the studios' economic interest to offer comparable revenue-sharing agreements to distributors, and answered: "Yes. In general. I mean different studios found it in their interest to have different arrangements, both with Blockbuster and with the independents, but yes, it was in their economic interest; their individual economic interest."

studio documents purportedly support this inference. The documents state the Blockbuster proposal would "place Blockbuster at a severe competitive advantage over other rental retailers," and "significantly reduce the studio's leverage on future transactions" (Fox);[15] Blockbuster would exercise its market share "to eliminate competition and negotiate improved terms with studios" (Warner);[16] with the competitive advantage of direct revenue sharing, "the large retailers, such as Blockbuster and Hollywood, are aggressively capturing market share at the expense of the smaller independent retailers" (Universal);[17] the increase in consumer rental spending in 1998 occurred mostly at the two largest chains "who launched aggressive campaigns . . . to increase market share," and "[m]ost of these gains have happened at the expense of the smaller chains and independents who are unable to compete" (Universal);[18] and, in a January 2000 document, "[a]ll studios have now embraced the concept of revenue sharing and are actively involved with Blockbuster and Hollywood," and "[m]ost small retailers still don't have reasonably priced access" (Universal).[19]

The evidence Eddins cites shows that the studios knew that their direct revenue-sharing agreements with Blockbuster gave Blockbuster a significant competitive advantage at the expense of smaller retailers. Moreover, in the abstract, actions that "create market power" among buyers of a firm's products may harm the firm, as studio expert Klein testified. However, no legal precedent supports the principle that, merely because a supplier knows that its largest customer intends to or has succeeded in increasing its market share through an innovative purchasing method, the supplier acts against its own economic self-interest, and we may infer a conspiracy, unless it successfully moves to counteract the significant competitive advantage obtained by the innovating customer. That is, no case permits an inference of

---

[15] The statement was in a Fox document dated February 3, 1998, updating the status of negotiations with Blockbuster.

[16] The document, dated April 30, 1998, states it is essential to provide revenue-sharing options to independent retailers and lists six reasons for doing so, including the one stated in the text. Another reason stated is the mitigation of price discrimination complaints.

[17] The document was an undated report reviewing the state of the video rental industry through 1998. The same document identified, as "issues" for Universal, that revenue sharing was "[d]riving rapid consolidation of retail business," "[m]ay not be practical for all retailers" and involved "[c]omplex administration and collection requirements."

[18] This document on Universal's rental strategy describes the state of the industry, and also observes that copy depth programs were initiated primarily as a way for distribution to service smaller second and third tier rental retailers to combat direct revenue-sharing programs.

[19] This third Universal document recounts the increase in Blockbuster's market share at the expense of the independent retailers, and also lists the issues facing smaller retailers, including that the smaller retailer may not be able to effectively handle additional product due to space limitations, adequate systems for monitoring are required, and the fact that the retailer must buy the studio's entire output, including nontheatrical releases.

conspiracy based solely on conduct—such as innovative purchasing agreements that are not in themselves illegal—that facilitates a customer's gain in market share. One firm's success in expanding its market share necessarily comes at the expense of other firms. We decline to conclude that the knowledge that these events are occurring in the marketplace permits an inference that suppliers of the innovating customer are colluding to deprive other customers of similar terms. Nothing about such knowledge, in and of itself, permits an inference that the studios agreed with each other to withhold favorable terms from the other customers, rather than that each acted, or failed to act, based on its independent business judgment that the terms were not suitable for or were not desired by the other customers. In short, without any other evidence that a studio's decision was contrary to its economic self-interest if taken independently, the specter of increasing market share in one customer is not suggestive of conspiracy.

Eddins relies on Toys "R" Us, Inc. v. FTC (7th Cir. 2000) 221 F.3d 928 (Toys "R" Us). Toys "R" Us provides an apt example of a case finding that an inference of conspiracy was proper from conduct that was not in defendants' legitimate economic self-interest. The case also illustrates, by contrast, the deficiencies of the evidence in Eddins's case. We therefore consider it in some detail.

In Toys "R" Us, the court upheld a Federal Trade Commission finding that a horizontal agreement existed among a number of toy manufacturers, orchestrated by Toys "R" Us (TRU) as the ringmaster, to boycott warehouse clubs (TRU's competitors) which were selling toys at a slender markup. Each manufacturer entered into a vertical agreement with TRU that it would sell the warehouse clubs "only highly-differentiated products (either unique individual items or combo packs) that were not offered to anything but a club . . . ." (Toys "R" Us, supra, 221 F.3d at p. 932.) These agreements eliminated the clubs' competitive threat to TRU by denying them merchandise, forcing the clubs' customers to buy products they did not want, and frustrating customers' ability to compare TRU and club prices. (Ibid.) In order to obtain the vertical agreements, TRU had to overcome a major hindrance, which was the manufacturers' reluctance to give up a new, fast-growing, and profitable channel of distribution, namely, the clubs. (Ibid.) The manufacturers "were also concerned that any of their rivals who broke ranks and sold to the clubs might gain sales at their expense, given the widespread and increasing popularity of the club format." (Ibid.) To solve this problem, TRU orchestrated a horizontal agreement among the toy manufacturers, which TRU enforced, to boycott the clubs by selling them only highly differentiated products, as described above.

The evidence the FTC relied upon "showed that, at a minimum, [seven toy manufacturers] agreed to join in the boycott *'on the condition that their competitors would do the same.'* " (*Toys "R" Us, supra*, 221 F.3d at p. 932, quoting the FTC's opinion.) Internal memoranda from the manufacturers showed that they were trying to expand, not to restrict, the number of their major retail outlets and to reduce their dependence on TRU. The memoranda also showed that the manufacturers were specifically interested in cultivating a relationship with warehouse clubs and increasing sales at the clubs. Consequently, "the sudden adoption of measures under which they decreased sales to the clubs ran against their independent economic self-interest." (*Ibid.*) Moreover, evidence from toy company executives and from TRU indicated that the only condition on which each toy manufacturer would agree to TRU's demands for a vertical agreement (restricting sales of popular toys to the warehouse clubs) was an assurance that its competitors were doing the same thing. (*Id.* at pp. 932, 936.) This condition was imposed because each manufacturer was afraid its rivals would cheat and gain a special advantage in a popular new market niche. A TRU officer testified that he communicated the message " 'I'll stop if they stop' " from manufacturer to competing manufacturer. (*Id.* at p. 932.) Evidence from the toy manufacturers also corroborated that testimony. After the boycott was underway, numerous examples in the evidence showed "TRU served as the central clearinghouse for complaints about breaches in the agreement." (*Id.* at p. 933.)

The evidence in this case lacks the critical ingredients present in *Toys "R" Us*. Unlike *Toys "R" Us*, no evidence exists of vertical agreements between Blockbuster and any studio to withhold Blockbuster-like terms from independents. The only evidence is that Blockbuster asked for exclusivity from Fox and that Fox refused. (See pt. I.B.3.a, *post.*) Unlike *Toys "R" Us*, no evidence indicates Blockbuster communicated any message from studio to studio about any studio's willingness to withhold favorable terms from independents. Unlike *Toys "R" Us*, no evidence indicates any studio feared acting alone in its sales to distributors, much less that any studio wanted or required assurance that others were not giving Blockbuster-like terms to distributors. And unlike *Toys "R" Us*, no evidence indicates Blockbuster "enforced" the alleged agreement by the studios to withhold terms from independents, and indeed no evidence showed any mechanism by which Blockbuster *could* enforce such an agreement. (See *Petruzzi's IGA, supra*, 998 F.2d at p. 1233 ["[g]ame theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great"].)

In short, the studios knew, as the success of direct output revenue-sharing agreements became apparent, that Blockbuster's market share—and that of other large chains—was growing, and growing at the expense of independent retailers. However, the studios' knowledge of these market share changes is

the sum total of probative evidence that the studios acted contrary to their individual economic self-interest. This evidence is insufficient to permit an inference that the studios conspired to withhold Blockbuster-comparable terms from independent retailers. In *Aguilar*'s terms, it is not evidence which "shows or implies unlawful conspiracy *more likely than* permissible competition . . . ." (*Aguilar, supra,* 25 Cal.4th at pp. 856–857.)

> b. *Motive for the alleged conspiracy: Eddins's evidence suggests no plausible motive for a conspiracy among the studios to deprive independent retailers of Blockbuster-comparable terms.*

Eddins claims that, in addition to acts against economic self-interest, evidence that a studio engaged in conduct that would be unlikely absent an understanding with the other studios is a "plus" factor suggesting a conspiracy. In support of this point, Eddins cites *City of Tuscaloosa,* which refers to "the implausibility that the defendants would have acted as they did had they not been unlawfully conspiring in restraint of trade" as a "plus factor." (*City of Tuscaloosa, supra,* 158 F.3d at pp. 570–571, fn. 34.) Eddins's argument fails on several levels.

First, characterizing conduct as implausible is simply another way of saying defendants acted against their individual economic self-interest. That is, defendants acted implausibly, in the absence of an agreement.[20] *City of Tuscaloosa* clearly so states. (*City of Tuscaloosa, supra,* 158 F.3d at p. 572 ["[o]ne prominent 'plus factor,' to which antitrust plaintiffs often take recourse, is a showing that the defendants' behavior would not be reasonable or explicable (i.e. not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade"].) Other courts likewise consider motive in tandem with actions contrary to a defendant's economic interest. (See *Schoenkopf, supra,* 637 F.2d at p. 208 [before an inference of conspiracy may be drawn, plaintiff must also show defendants acted in contradiction of their economic interests and had a motive to enter into an agreement]; 6 Areeda, Antitrust Law, *supra,* ch. 14, ¶ 1434c2 ["no conspiracy should be inferred from ambiguous evidence or from mere parallelism when the defendants have no incentive to conspire"].)

---

[20] A defendant's "economic self-interest" refers to "what that defendant's legitimate economic self-interest would be under the assumption that it acted alone . . . ." (*City of Tuscaloosa, supra,* 158 F.3d at p. 570, fn. 33.) That is, the plaintiff "must establish that each defendant would have acted unreasonably in a business sense if it had engaged in the challenged conduct unless that defendant had received assurances from the other defendants that they would take the same action." (*Bolt v. Halifax Hosp. Medical Center* (11th Cir. 1990) 891 F.2d 810, 826–827.)

Second, in any event, Eddins's evidence is short on any logical reason for the studios to conspire among themselves or with Blockbuster to withhold Blockbuster-comparable terms from distributors for independent retailers. Eddins contends the evidence indicated a studio would not "price discriminate in Blockbuster's favor" without an understanding that the other studios would do so, because otherwise independents would retaliate by shifting support to nondiscriminating studios. However, "price discriminat[ion] in Blockbuster's favor"—the revenue-sharing agreements with Blockbuster—would exist with or without an agreement among the studios to withhold comparable terms from distributors. (See fn. 22, *post*.) The pertinent question is whether any motive exists for the studios to agree to withhold Blockbuster-comparable terms from independent retailers. Eddins advances no plausible reason why the studios would conspire to favor Blockbuster by denying output terms to independents, when independents constituted a large segment of its customer base. (See *Zoslaw v. MCA Distributing Corp.* (9th Cir. 1982) 693 F.2d 870, 885 ["appellants are unable to advance any plausible reason why the major record distributors would conspire to favor certain retailers, thus limiting the retail outlets for their own products"].) While it is plausible that Blockbuster would want to disadvantage its competitors, no reason appears why the studios would agree.[21]

Eddins answers that Blockbuster employed both coercion and enticement to induce the studios to disadvantage the independent retailers by refusing to give the Blockbuster terms to distributors for independents. The coercion consisted of threatening to and actually reducing purchases from studios which were reluctant to agree to revenue sharing. While the evidence that Blockbuster threatened to reduce purchases is undisputed, it only explains why the studios ultimately acquiesced to output revenue-sharing agreements with Blockbuster. It does not explain why they would agree not to offer such

---

[21] Eddins cites *City of Tuscaloosa, supra*, 158 F.3d 548. However, the case is not helpful to Eddins, as it, too, demonstrates by contrast the deficiency in Eddins's evidence. In *City of Tuscaloosa*, Alabama municipal entities alleged that defendant chemical companies engaged in a conspiracy to fix prices for repackaged chlorine, allocate customers or markets, and rig bids. The court observed that: "Oligopolists behaving in a legal, consciously parallel fashion could achieve high and rising prices, even as costs remained stable, by engaging in price leadership. [Citation.] The odds that they could achieve a price and profit increase *and* maintain incredibly high incumbency rates—that is, maintain the very same distribution of municipal contracts year after year—are minuscule, however, unless the oligopolists were communicating with one another. In sum, this combination of high profits and high incumbency would not be likely to occur if the defendants either were vigorously competing with each other or were engaging in competitive price leadership. It would be permissible for a jury to find, therefore, that the defendants were not in fact competing for [municipal] contracts but were concertedly protecting each others' incumbencies and pushing up prices." (*City of Tuscaloosa, supra*, 158 F.3d at pp. 572–573, fns. omitted.) In this case, there was no comparable combination of events or occurrences for which the odds were "miniscule," or that were in any way unlikely or inexplicable in the absence of a conspiracy.

terms to distributors that served a great many of their customers.[22] The evidence purporting to show that Blockbuster enticed or induced the studios to agree to deny output revenue-sharing terms to distributors for independents is likewise deficient. Eddins's separate statement identifies (1) a portion of the report of Eddins's economic expert, Professor James L. Sweeney, and (2) a single document, entitled "Blockbuster Overview," prepared for a Viacom executive committee meeting on February 24, 1999.[23] The latter document contains a "Revenue Share Financial Review," and shows the revenue increases by studio, for each studio and for Blockbuster. This document demonstrates that, except for Warner, each studio's incremental increase in revenues, as a result of revenue sharing with Blockbuster, was greater than Blockbuster's incremental increase in revenues. It is difficult to discern the probative value of the studios' larger incremental increase in revenues. There is no evidence the studios knew or anticipated that their incremental revenue increases would be greater than Blockbuster's when they acquiesced, in some cases very reluctantly, to Blockbuster's revenue-sharing proposals. Moreover, even if the studios anticipated higher incremental revenues, the document at most merely shows why a studio would be persuaded to revenue share with Blockbuster, not why it would refuse to do so with distributors for independents.

The remaining evidence that Blockbuster enticed the studios to agree to withhold the Blockbuster terms from independent retailers is the evidence from Sweeney, Eddins's economist. Sweeney opined in the Texas case that

---

[22] The evidence Eddins cites for its contention the studios would not favor Blockbuster, without an understanding that the other studios would do the same, does not suggest any agreement on withholding favorable terms from independent retailers. Eddins cites two studio documents from Warner, a nondefendant. One of them is a January 1998 report analyzing Blockbuster's proposal for output revenue sharing during Warner's negotiations with Blockbuster, and the other is a May 27, 1997 outline analyzing and rejecting an earlier Blockbuster proposal for price concessions apparently unrelated to revenue sharing. The documents are addressed to the risks of entering revenue-sharing agreements with (or providing price concessions requested by) Blockbuster, not to the risks (or advantages) of refusing to provide those terms to others. One of the risks of a Blockbuster agreement was that the studio's other customers would shift business to studios which were not revenue sharing with their largest competitor. The May 1997 document was created well before any output revenue-sharing agreements were executed or anticipated, and evidences nothing other than ordinary competitive analysis. It is difficult to see how any inference of collusion could conceivably be drawn from either document.

[23] Eddins also cited one other item: a chart prepared by Sweeney, comparing the average price Blockbuster paid to each studio defendant and the average price paid by distributors, with Blockbuster's average price ranging from $18.69 to $26.39, and the "all distribution" average price ranging from $41.74 to $48.27. While this chart shows that Blockbuster's average price per tape was less than that paid by distributors, that is hardly surprising given the different terms on which each were purchasing. The pertinent question is whether those different terms were the result of a conspiracy; the fact that the terms were different does not assist in that inquiry.

the prices distributors paid for videotapes were "substantially higher than the competitive price, the price arrived at by independent decision making in a workably competitive market," and that this disparity "was the result not of competitive market forces, but of the defendants' conduct in price fixing and price discrimination." Sweeney determined that, but for the studios' conduct, the competitive price for a videotape would have been $16, $2 less than the average $18 price at which studios sell DVD's on a wholesale basis. As a result of its revenue-sharing agreements, Blockbuster paid the studios, on average, $22 per videotape. Under Sweeney's scenario, the studios had a plausible motive to conspire, because each of them "accepted a higher than competitive price from Blockbuster as part of the inducement to entering into the conspiracy."

We reject Sweeney's analysis. An expert's opinion must be supported by sufficient facts to validate it in the eyes of the law. (*Brooke Group, supra,* 509 U.S. at p. 242.) The evidence is undisputed that, before the Blockbuster agreements, retailers and distributors alike purchased tapes from the studios at $65 per tape. Indeed, some studios were reluctant to abandon the traditional $65 per tape price and instead agreed to revenue sharing that ultimately resulted in an average per tape price to Blockbuster of $22 per tape. Yet Sweeney opines that $22 was a "supra-competitive price," even though it is more than $40 lower than the traditional price it replaced. The circumstances belie Sweeney's implicit assumption that the studios acted based on an understanding that, under their revenue-sharing agreements with Blockbuster, Blockbuster would be paying a "supra-competitive price" for its videotapes. In short, no factual basis permits the inference of conspiracy that Sweeney suggests; no evidence indicates the studios thought they were obtaining a supra-competitive price from Blockbuster, giving them a plausible economic motive to conspire to withhold similar terms from distributors. As the Fifth Circuit said of other aspects of Sweeney's testimony, "[s]uch speculative and self-serving expert testimony is an insufficient basis for plaintiffs' claims of concerted action." (*Cleveland v. Viacom Inc., supra,* 73 Fed.Appx. at p. 741; see *Aguilar, supra,* 25 Cal.4th at p. 864 [expert opinion is not a substitute for market facts].)[24]

In the end, Eddins insists both that the studios would have made more money through output revenue sharing with distributors (and therefore acted against individual interest in not doing so), and that the studios benefited

---

[24] In its brief, but not in its separate statement, Eddins also cites an excerpt from the report of another economic expert who testified on damages in the Texas trial, Dr. Jeffrey Leitzinger. Leitzinger concluded that the studios' revenue gains from the Blockbuster deals "more than offset the loss in revenue from independent retailers." Eddins does not give Leitzinger's sources for this conclusion, and it is settled that an expert's report—much less an excerpt from an expert's report—"cannot be used to prove the existence of facts set forth therein." (*In re Citric Acid Litigation* (9th Cir. 1999) 191 F.3d 1090, 1102.)

from an agreement not to offer those moneymaking terms to distributors, by obtaining supra-competitive prices from Blockbuster (the same prices that they would not offer to distributors). The first prong of this scenario has no support in the evidence and the second prong is demonstrably implausible.

 c. *The Attorney General's position: Amicus curiae's contention that the trial court erred by ignoring expert testimony is without merit, because Eddins did not direct the trial court to the evidence cited by the Attorney General.*

The Attorney General's amicus curiae brief asserts that the trial court improperly ignored admissible expert testimony that the studios' conduct was contrary to their self-interests, and therefore was more likely the result of collusion than of independent action. The Attorney General complains that the trial court acknowledged only two aspects of Eddins's evidence, namely that each studio knew of its competitors' deals with Blockbuster and distributors, and that the studios recognized that their economic interest required Blockbuster-type agreements with as many customers as possible. The trial court erred "by ignoring critical economic evidence" from Professor Sweeney, who opined that there was no reason the studios could not offer Blockbuster-like deals to distributors; that the studios' revenues would increase if they did so; and that the studios' behavior created market power in one customer, Blockbuster, and was rational only if a conspiracy existed.

We leave aside the question whether Sweeney's evidence was probative. The Fifth Circuit rejected portions as "simplistic" and "conclusional,"[25] and we reject, as unfounded, Sweeney's supra-competitive pricing theory as a plausible motive for conspiracy. We also leave aside the question whether it is proper to assume the trial court did not consider evidence simply because the court did not mention it. The decisive point is that Eddins failed to direct the trial court to the evidence cited by the Attorney General. Eddins did not rely on Sweeney's opinion on this point in plaintiffs' opposition to summary judgment, either in the separate statement or in the accompanying memorandum of points and authorities. The trial court cannot be expected to address expressly every piece of evidence contained in a voluminous record, much less address evidentiary items on which a party has not relied to create a disputed issue of material fact. (See *San Diego Watercrafts, Inc. v. Wells*

---

[25] The Fifth Circuit determined that Sweeney's testimony was based in part on the simplistic assumption that, because the studios received greater revenues under their deals with Blockbuster, they also would have received greater revenues under similar deals with distributors serving independents, an approach which "ignores significant differences between independent retailers and large chains such as Blockbuster." (*Cleveland v. Viacom Inc., supra,* 73 Fed.Appx. at pp. 740–741.)

*Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499] [court may ignore evidence not disclosed in moving party's separate statement of undisputed facts]; *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 336 [282 Cal.Rptr. 368] [" 'just as is the case with the moving party's separate statement, the opposing party is required by the statute, in connection with each fact which the opposing party disputes, to follow the statement of that fact by reference to the evidence which creates the dispute' "], quoting *Blackman v. Burrows* (1987) 193 Cal.App.3d 889, 896 [238 Cal.Rptr. 642].) We discern no reason to depart from these well-established principles.

> 3. *The evidence of pretext: Evidence that distributors and independent retailers requested the Blockbuster terms does not tend to exclude the possibility that the studios acted independently in failing to offer those terms to distributors.*

■ To infer a conspiracy from consciously parallel conduct, the action against economic self-interest must also be such as " 'not to amount to a good faith business judgment.' "[26] (*Royal Drug, supra*, 737 F.2d at p. 1437; see 6 Areeda, Antitrust Law, *supra*, ch. 14, ¶ 1434c2 [" 'contrary to self-interest' usually refers to the absence of an independent business reason for the challenged conduct"].) Eddins contends, in effect, that its evidence that distributors and independent retailers sought Blockbuster-comparable terms is sufficient to allow an inference that the studios agreed among themselves not to offer those terms to distributors. According to Eddins, the evidence that Ingram and Rentrak asked for comparable terms tends to exclude the possibility that the studios acted independently, that is, in the exercise of each studio's independent business judgment.

Again, we cannot agree. As we have seen, Eddins's evidence does not suggest a plausible motive for a conspiracy. It does not reasonably support an inference of conduct contrary to a studio's economic self-interest. It does not include any of the customary indications of traditional conspiracy. (See

---

[26] The court in *In re Flat Glass Antitrust Litigation* (3d Cir. 2004) 385 F.3d 350, 360–361 (*Flat Glass*) observes that the "plus" factors of motive and actions contrary to economic interest, in the context of a price-fixing conspiracy, are relevant, but since they often restate the ordinary concept of interdependence in an oligopolistic market, "they may not suffice—by themselves—to defeat summary judgment on a claim of horizontal price-fixing among oligopolists."

fn. 11, *ante*.) If the evidence supported any of these "plus" factors, then Eddins's evidence that distributors asked for the Blockbuster terms (though they never knew what those terms were), and the evidence that some independents wanted and were capable of output revenue sharing, might conceivably enhance the conspiracy hypothesis. Absent significant probative evidence of any of the "plus factors," however, the evidence of "pretext" loses any force it might otherwise have had. In short, although Eddins correctly asserts that the question "[w]hether distributors and independents wanted and could do Blockbuster-comparable deals is a disputed issue of fact only a jury [could] resolve," it is not a material issue. The resolution of the question in Eddins's favor would not allow a jury to infer an agreement among the studios to withhold Blockbuster terms from independents.[27]

Moreover, even if evidence of pretext, in the absence of other "plus" factors, could suffice in theory to create an inference of conspiracy, Eddins's evidence of pretext fails, because it does not tend to exclude the possibility that the studios acted independently rather than collusively. (*Aguilar, supra*, 25 Cal.4th at p. 852.) This conclusion is demonstrable from a review of (a) Eddins's related claim that, "[f]rom the beginning, the plan was to provide to Blockbuster revenue sharing terms that would not be offered to distributors," and (b) the remainder of the evidence Eddins advances to support the claim that the studios' conduct did not amount to a good faith business judgment.

---

[27] In contrast with the case at bar, a case illustrating probative evidence of pretext is *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.* (7th Cir. 1999) 190 F.3d 775, 779. The evidence of pretext in *JTC Petroleum* is clear, and is used only in combination with other probative evidence of a conspiracy. In *JTC Petroleum*, the plaintiff, a road repair contractor, brought an antitrust suit against its competitors (the applicator defendants) and asphalt producers (the producer defendants). The producers settled. JTC tried to show that the applicators enlisted the producers in their conspiracy, "assigning them the role of policing the applicators' cartel by refusing to sell to applicators who defied the cartel—such as JTC, which has bid for jobs that the cartel had assigned to other applicators." (*Id.* at p. 778.) Since the producers had nowhere else to sell their asphalt, the applicator defendants could "coerce them into helping to police their cartel by threatening to buy less product from them or pay less for it," or may have been paying the producers rather than coercing them. (*Ibid.*) The court observed there was also evidence "that the reasons the producers gave for refusing to sell to JTC were pretextual . . . ." (*Id.* at p. 779.) For example, the producers said they refused to sell to JTC because it was not a good credit risk. However, when JTC offered to pay cash, the producers still refused to sell. "This suggests that the real reason for the refusal was . . . that they were being compensated by the cartel for refusing to sell to a customer whom otherwise they would have been happy to sell to." (*Ibid.*) "Given the evidence of cartelization at both the applicator and producer level, the suspicious producer price behavior (suggestive of the producers' having been 'paid off' by the cartel to boycott JTC and other upstarts), and the pretextual character of the reasons the producers gave for the refusal to deal, a rational jury could conclude that JTC was indeed the victim of a producers' boycott organized by the applicator defendants." (*Ibid.*)

a. *Blockbuster's exclusivity request: The evidence did not show that Blockbuster asked each studio to withhold comparable revenue-sharing terms from independent retailers.*

Eddins's brief asserts that plaintiffs "present[ed] evidence that . . . Blockbuster asked each studio not to make Blockbuster's favored terms available to independents . . . ."[28] This assertion is representative of the gloss Eddins places on the evidence it cites. No evidence indicates Blockbuster "asked each studio" not to make its terms available to independents. There is evidence that Blockbuster wanted exclusivity from Fox, and told Fox it wanted a special deal that it did not want offered to independents. No evidence indicates Fox agreed to this, and indeed the very evidence showing the Blockbuster demand also demonstrated that Fox had no intention of granting it.[29] Moreover, there is no evidence of a Blockbuster demand for exclusivity to any other studio. And in any event, a wrongful request by Blockbuster for exclusivity does not support an inference of conspiracy in the absence of the necessary evidence that the studios' failure to offer output revenue sharing to distributors was " 'contrary to their economic self-interest so as not to amount to a good faith business judgment.' " (*Royal Drug, supra*, 737 F.2d at p. 1437.) In other words, it does not matter whether Blockbuster wanted a deal that was not available to its competitors. The question is whether one can reasonably infer the studios acquiesced to any such demands by Blockbuster. To do so, the evidence must allow a reasonable inference that the studios did not make good faith business judgments in their transactions with distributors for independents. As *Aguilar* instructs, the evidence or inferences reasonably drawn from it must show or imply that it is "more likely than not" that each studio's failure to offer output revenue sharing to distributors was the result of a conspiracy, rather than the exercise of independent business judgment. (See *Aguilar, supra*, 25 Cal.4th at p. 852.)

---

[28] This evidence, Eddins says, contradicts the studios' claim they did not offer Blockbuster terms to independent retailers because distributors and independents did not want them, and is a part of the evidence of pretext.

[29] The evidence that Blockbuster asked Fox not to give the same terms to independents is found in the deposition testimony of John Caesar, an independent retailer who testified that Don Jeffries of Fox said that "Blockbuster wanted a special deal and that they did not want it to be offered to independents." Eddins's evidence also showed that Fox would not agree to offer exclusive terms to Blockbuster.

b. *Other evidence of pretext: The evidence of general requests by distributors for output options, and of predictions that small retailers would embrace output revenue sharing, does not tend to exclude the possibility that the studios acted independently.*

The remainder of the "mountain of evidence," purportedly demonstrating that the studios' reasons for not making Blockbuster-comparable terms available to independent retailers were "entirely pretextual," is no more helpful to Eddins. Stated broadly, the studios asserted a belief that distributors and independents did not want or could not make Blockbuster-type output arrangements, and Eddins's evidence suggests the opposite. Thus:

—Each defendant studio presented direct testimony, from the studio executive responsible for negotiating its revenue-sharing agreement with Blockbuster, that the studio made no agreement with Blockbuster or with any competitor to withhold comparable terms from distributors or independent retailers. Each executive explained in considerable detail the course of the studio's negotiations with Blockbuster on direct revenue sharing, as well as its discussions or conduct vis-á-vis distributors and retailers in the wake of the Blockbuster agreements. (See fn. 8, *ante.*) Each executive explained, in one form or another, that distributors and independents were not interested in the Blockbuster form of revenue sharing, once they understood its requirements.[30] The requirements included a multiyear obligation to acquire multiple copies of all of the studio's film releases (including direct-to-video titles), whether successful at the box office or not, as well as minimum guarantees, computerized tracking and auditing requirements,[31] and so on.

---

[30] For example, Disney's Michael Johnson explained that Disney focused its revenue-sharing efforts on large chain retailers, because "[t]hey would be more likely to have the internal distribution facilities and financial reporting software required to make revenue sharing work." Disney concluded that the small independent video retailers generally were not interested in revenue sharing on an output basis because they did not want to have to commit to purchase all of Disney's video releases, preferring to cherry pick which to purchase based on what they believed would rent best in their local markets. Johnson also cited a lack of technology to support the software necessary for revenue sharing and a disinclination to share business information with others as reasons independents were not interested in output revenue-sharing deals. The declaration of Universal's William P. Clark also cited unwillingness to pay the guarantees that Blockbuster agreed to pay. Eric Doctorow of Paramount observed that Paramount's discussions with Ingram and other wholesale distributors encountered the obstacle of lack of adequate reporting and tracing systems, and distributors' reports of lack of demand sufficient to justify the expense of developing, buying or licensing the necessary systems. Declarations from other studio executives, while different in details, were comparable.

[31] Revenue sharing, unlike traditional purchasing, requires that all rental transactions at the retail level be tracked and accounted for in order to accomplish an accurate split between the studio and the customer.

The executives also described the various programs they devised to provide copy depth for retailers who could not or would not participate in revenue sharing.

—In response to the studios' evidence, Eddins contends he has produced evidence from which we may infer that the studios' stated reasons for not offering Blockbuster terms to distributors were false, and that the real reason was a conspiracy among the studios and Blockbuster to favor Blockbuster and, in effect, to drive independent retailers out of business. The evidence, as Eddins describes it, is that:

> —Ingram (the largest distributor) requested the studios to provide the Blockbuster terms.[32]

> —Rentrak—the distributor which had offered retailers "cherry-pick" revenue sharing since 1992—requested the studios to provide it the reduced revenue-sharing percentage so it could make output revenue sharing available to independents. (The revenue share to the studio under cherry-pick revenue sharing is greater than its share under output revenue sharing.)[33]

> —In a deposition in the Texas case, an executive from Rentrak testified that his "guess" was a majority of independents, other

[32] Ingram's testimony is not as straightforward as Eddins suggests. Ingram testified that his company asked the studios to provide it the best possible revenue-sharing terms and the most choices and variety possible. "And clearly, if there were terms being offered to large retailers on a direct basis, we would try to most closely duplicate that for our dealers . . . ." When Ingram was asked if he asked studios to provide him output revenue-sharing agreements, he answered: "I don't know what was asked of the studios beyond we were asking for the best possible deals for our dealers." When Ingram was asked, "So is it your testimony that you wanted both output and nonoutput agreements?", his answer was: "I think that is accurate, yes, that we wanted maximum flexibility for our dealers." Ingram was then asked if that was because his dealers were requesting those agreements, and he answered: "Our dealers were requesting to have revenue-sharing programs with maximum flexibility."

[33] The evidence consists of three defense exhibits from the Texas trial relating to Rentrak's negotiations with Fox: (1) An August 3, 1998 letter to Fox (Pat Wyatt) from Marty Graham at Rentrak, with Rentrak's thoughts on the fee structure Fox should consider in exchange for a retailer's commitment to acquire 100 percent of its output on a revenue-sharing basis, and the comment that "there is a strong economic incentive for the retailer to shift his/her purchasing to the output agreement terms—exactly what we expect a majority of our retail customers to do"; (2) an August 21, 1998 letter from Rentrak to Fox, reporting that Rentrak has amended the terms of one of its supplier agreements to include an output option for retailers, and enclosing a summary of key terms, which included a one-year term for the output option; and (3) a letter of April 8, 1999 from Rentrak to Fox enclosing an "output" analysis and stating that the terms would generate 70 percent more margin dollars for Fox, from retailers willing to enter into output agreements, and that smaller retailers needed an output option that would enable them to more effectively compete with the biggest retail chains.

than those with credit problems or stores generating less than $4,000 a month in rental revenues, "would be signed up" for output revenue sharing if it were available.

—On two occasions, plaintiff Webb, representing 400 independent retailers in the Independent Video Retailers Group (IVRG), went outside normal distribution channels and asked studios directly for the Blockbuster terms (although he did not know what they were).[34]

None of this evidence of general requests for output agreements, or a distributor's guesses that small retailers would embrace output revenue sharing, actually contradicts the studios' direct testimony about their dealings with distributors and their thoughts about the kinds of arrangements desired by independent retailers. It does not tend to exclude the possibility that the studios acted independently rather than collusively in their failure to offer the Blockbuster terms to distributors. It is not possible to review the evidence in this case without concluding that the studios, correctly or incorrectly, believed that small independent retailers did not like the idea of and/or could not participate in direct output revenue sharing, and that most distributors also were averse to revenue sharing. For example, in a December 1997 Fox summary describing the revenue-sharing models Blockbuster was proposing to the major studios, the writer states: "What is unknown is the potential negative effect that a favored revenue share relationship with BB would have on the remaining 75% of our rental business. It is estimated that no more than 35% of the rental market including BB could accommodate a direct revenue sharing arrangement with major studios. We would be extremely challenged to come up with an equitable arrangement with the balance of this market." Eddins appears to suggest the reference to a "favored revenue share relationship" is significant. However, this assessment of a proposed business relationship—to which Fox did not agree for almost another year—is consistent with a practical assessment of how such arrangements would favor the large chains. The document evinces a recognition that output revenue sharing will change the contours of the industry and will make it difficult for smaller

---

[34] Webb testified that at the spring 1999 meeting of the IVRG, he asked Jeffries of Fox, on behalf of the IVRG, for the same terms Blockbuster had. A declaration from Webb also enclosed a June 5, 1998 letter he wrote to all the major studios, asking them to extend to all video retailers "prices, terms, and conditions that will eliminate any discrimination or unfair advantages," including "any term that Blockbuster or others might be receiving that we are not." Eddins cites a February 25, 1999 letter from Webb to Columbia, expressing the appreciation of the IVRG for a February 11, 1999 meeting, and stating Webb had begun the process of collecting data from IVRG members. Eddins also cites the testimony of Robin Russell of Columbia about the same meeting, explaining that the IVRG "thought they wanted the quote, unquote Blockbuster deal," and "came to us to discuss the possibility of creating a buying group, so they would be large enough to enter into a direct relationship."

retailers to compete. It does not, however, reasonably suggest an agreement among the studios to prevent them from competing.[35]

In short, nothing in Eddins's evidence allows a reasonable inference that the studios were not making good faith business judgments. (See *In re Citric Acid Litigation, supra*, 191 F.3d at p. 1101 ["firms must have broad discretion to make decisions based on their judgments of what is best for them and . . . business judgments should not be second-guessed even where the evidence concerning the rationality of the challenged activities might be subject to reasonable dispute"].) At most, the evidence is that Ingram, the largest distributor, asked the studios in general terms for "the best possible revenue-sharing terms and the most choices and variety as possible." There is no evidence of a specific written proposal from Ingram to any studio, or any evidence that any studio refused to respond to any proposals. Ingram testified that the studios told him that smaller retailers "want the best part of the Blockbuster deal without the output piece of it, is the recurrent theme I have heard from the studios . . . ." Indeed, he stated that, in his view, a "[r]elatively small percentage" of his customer base could handle seven output deals from all of the major studios simultaneously. As for Rentrak, it made proposals to Fox (see fn. 33, *ante*); Fox negotiated with Rentrak on its proposals; and the two eventually reached an agreement with an output option, which contained a much shorter term (one year) than any of the Blockbuster agreements. As for the Webb testimony, it is uncontroverted that the IVRG did not follow up with Fox to provide the data needed in order to begin a direct output revenue-sharing agreement. At bottom, the mere fact that Ingram or Rentrak requested the "Blockbuster deal," but ultimately negotiated different terms, is scarcely indicative of a conspiracy, because that evidence does not contradict any studio's evidence about its individual dealings with distributors and independent retailers. For example, Ingram does not contradict Paramount's testimony that Paramount negotiated with Ingram for over a year on the adequacy of its tracking and reporting system, or its testimony that other distributors had no such system and lacked sufficient demand to justify the cost of developing or buying the necessary systems.

---

[35] Eddins points to another document, an October 30, 1997 Disney memo from Michael Johnson to Michael Eisner, reporting that Disney was planning to adopt the revenue-sharing model. Eddins points to one sentence in this memo: "Blockbuster represents 20–25% of the rental business and we hope to roll this out to a few other key retailers representing another 15–20%." According to Eddins, we may infer from this sentence that Disney agreed with Blockbuster to withhold those terms from the remaining 55 percent of the market. To draw such an inference, however, would be pure conjecture. The statement is entirely consistent with an independent decision to try a new business model on the segment of the market—large chains—with which it was most likely to be successful.

The quoted evidence illustrates that the documents, when read in their entirety and in context, cannot reasonably be construed as Eddins suggests. Eddins's evidence does not contradict the studios' evidence, for example, that they were concerned with the impact of Blockbuster-type direct revenue sharing on smaller retailers, and created various copy depth programs to help smaller retailers compete. Indeed, many of Eddins's documents confirm the studios' testimony that they believed many smaller retailers were opposed to revenue sharing or did not want to make a long-term commitment to purchase a studio's entire output. For example, in addition to the evidence discussed, a "Distributor Buy-Back Program Proposal" from Disney dated July 9, 1998— included in Eddins's opposition evidence—cited benefits of the program: "Retail perception that the buy-back option allows them to better compete against Blockbuster and Hollywood. Many retailers are strongly opposed to revenue sharing, so a buy-back is the perfect alternative for them." Similarly, a Texas plaintiff testified about choosing a cherry-picking program from Warner, instead of an output option that Warner offered. The plaintiff indicated the former was more advantageous to him because his monthly budget might preclude him from buying every title that the studio would require him to buy in that month. In sum, from the evidence Eddins offers, one simply cannot infer that the reasons the studios gave for failing to offer the Blockbuster terms to distributors for independents were false, or that their conduct did not amount to a good faith business judgment. (*Royal Drug, supra,* 737 F.2d at p. 1437 ["plaintiffs have failed to come forward with any significant probative evidence that would establish a fact issue as to whether the [defendants] did not act according to independent exercises of their respective business judgments"].)

c. *Admissibility of the Ingram documents: Although the trial court erred in excluding from evidence two letters Ingram wrote to the studios, the error was not prejudicial.*

Finally, we agree with Eddins that two letters Ingram wrote to the studios—one dated December 14, 1998, and another dated November 16, 2000, enclosing the earlier letter—should have been admitted in evidence. The two letters were admissible as nonhearsay to show the studios' knowledge—that is, to prove the studios knew, in December 1998, that Ingram believed that direct revenue-sharing relationships create unfair advantages for "the bigs" because their terms differ, and that "[o]utput deals have either not been available to all retailers, or if available, have not been practical or profitable." The letters were not admissible for any other purpose, however, and the trial court's error was not prejudicial, because the letters add nothing to the sum of the evidence pointing to conspiracy as more likely than permissible competition. Since Ingram's letters were sent to all the studios, the letters tend to show each studio knew the others did not have output

contracts with distributors, but that point is not in serious dispute. Contrary to Eddins's assertion, the letters do not state or imply that Ingram "requested the Studios to provide the Blockbuster terms." The letters show only that Ingram believed direct revenue sharing was hurting the industry and creating unfair advantages for "the bigs," and that the studios should consider the points Ingram made "[b]efore launching into multi-year deals with the big [retailers] . . . ."[36]

 C. *As a matter of substantive antitrust law, Aguilar requires a plaintiff to produce evidence that "shows or implies unlawful conspiracy more likely than permissible competition" in order to avoid summary judgment.*

■ Before leaving the subject of conspiracy, we must address the parties' contentions as to the proper interpretation of the evidentiary standard announced in *Aguilar.* Under *Aguilar,* a plaintiff such as Eddins: "must present evidence that would allow a reasonable trier of fact to find in his favor on the unlawful-conspiracy issue by a preponderance of the evidence, that is, to find an unlawful conspiracy more likely than not. Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow such a trier of fact so to find. . . . Therefore, in addition, the plaintiff must present evidence that tends to exclude, although it need not actually exclude, the possibility that the alleged conspirators acted independently rather than collusively. Insufficient is a mere assertion that a reasonable trier of fact might disbelieve any denial by the defendants of an unlawful conspiracy." (*Aguilar, supra,* 25 Cal.4th at p. 852, fn. omitted.)

---

[36] The trial court did not err in excluding Ingram Entertainment's strategic plans for 1999, 2000 and 2001. The strategic plans were not admissible under the business records exception to the hearsay rule. A business record is "a writing made as a record of an act, condition, or event," and may be used to prove the "act, condition, or event" if certain conditions are met. The conditions include requirements that the record was made "in the regular course of a business;" "at or near the time of the act, condition, or event;" and the "sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.) We doubt that a strategic plan—containing observations about industry developments, and opinions and statements of past actions and future plans—may be considered a "record of an act, condition, or event" within the meaning of the business record exception to the hearsay rule. (See *People v. Campos* (1995) 32 Cal.App.4th 304, 309–310 [38 Cal.Rptr.2d 113] [reports of nontestifying medical experts and probation report were not admissible as business records because they were records of conclusions, not an " 'act, condition, or event' "].) Moreover, the plans in this case do not meet the trustworthiness requirement of the rule. As Ingram himself testified: "Clearly, we are trying to write an accurate plan with accurate information in it, but there is no assurance that the information in the plan is accurate, and in some cases information in the plan might be more on the case of speculation or best guess . . . ." Eddins's further argument that the business plans were admissible to show "operative facts, notice, knowledge and state of mind" is likewise without merit.

On appeal, the parties conduct an extensive debate over the meaning of *Aguilar*'s pronouncement, and at least one other court has done so as well. (See *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 879–882, (maj. opn.), 888–890 (conc. opn.) [116 Cal.Rptr.2d 158] (*Kids' Universe*).) Eddins's ultimate position is that, "[w]hen *Aguilar* is correctly construed, summary judgment for defendants is permissible in antitrust conspiracy cases only where, as is true in any California case, the plaintiff's evidence is so utterly ambiguous that no reasonable juror could find for plaintiff." On the other hand, Blockbuster and the studios emphasize that plaintiffs are required to show "that their circumstantial evidence makes an inference of conspiracy more likely than the competing inference of competition."

■ We find no need to wade far into the parties' debate, because even under Eddins's articulation of the rule, summary judgment would be appropriate, as no reasonable juror could find an unlawful conspiracy. In short, this is not a case where there are "equally conflicting inferences to be drawn from the evidence . . . ." (*Kids' Universe, supra*, 95 Cal.App.4th at p. 881.) Moreover, Eddins also fails to recognize that the distinction *Aguilar* draws between an antitrust case and any other summary judgment case is one derived from antitrust law, not from summary judgment law. That is, while normal summary judgment principles apply in antitrust cases, "an important distinction exists." (*Flat Glass, supra*, 385 F.3d at p. 357.) The distinction is that "certain 'inferences may not be drawn from circumstantial evidence in an antitrust case.' " (*Ibid.*, quoting *InterVest, Inc. v. Bloomberg, L.P.* (3d Cir. 2003) 340 F.3d 144, 160; see *Matsushita Elec. Industrial Co. v. Zenith Radio* (1986) 475 U.S. 574, 588 [89 L.Ed.2d 538, 106 S.Ct. 1348] ["antitrust law limits the range of permissible inferences from ambiguous evidence" in a conspiracy case].) *Aguilar*'s articulation of this very point is clear. Consequently, it is unnecessary to apply any gloss to the Supreme Court's directives on the subject. "Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow" a trier of fact "to find an unlawful conspiracy more likely than not." (*Aguilar, supra*, 25 Cal.4th at p. 852.) This principle is a matter of substantive antitrust law. (*Ibid.*)

■ We may not weigh the evidence, and we must construe it in the light most favorable to Eddins. However, "even though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.* . . . In so doing, it does not decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself." (*Aguilar, supra*, 25 Cal.4th

at p. 856, fn. omitted.)[37] *Aguilar* continued with an explicit description of the circumstances under which a trial court must deny or grant defendants' motion for summary judgment in an antitrust conspiracy case: "[I]f the court determines that any evidence or inference presented or drawn by the plaintiff indeed shows or implies unlawful conspiracy *more likely than* permissible competition, it must then deny the defendants' motion for summary judgment . . . . [¶] But if the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply unlawful conspiracy *only as likely as* permissible competition *or even less likely*, it must then grant the defendants' motion for summary judgment . . . ." (*Aguilar, supra*, 25 Cal.4th at pp. 856–857.)

At every necessary juncture, Eddins's evidence fails to raise a reasonable inference that a conspiracy among the studios and Blockbuster to refuse comparable output revenue-sharing terms to independents was more likely than not. Nothing in Eddins's evidence "tends to exclude . . . the possibility" that the studios acted independently rather than collusively. (*Aguilar, supra*, 25 Cal.4th at p. 852.) The evidence does not support a finding of consciously parallel activity in studio decisions on revenue sharing with distributors, since the evidence did not show that any studio's knowledge of another studio's deal terms played any part in its own decisions on distributor deals (pt. I.B.1, *ante*). And, even if the evidence supported a finding of conscious parallelism, it fails at other critical points. It does not allow an inference that the studios acted against their individual economic interests (pt. I.B.2.a, *ante*). It does not suggest a plausible motive for the alleged conspiracy (pt. I.B.2.b, *ante*). It does not suggest the studios' conduct was more consistent with an agreement to withhold favorable terms from independent retailers than with the independent exercise of good faith business judgment (pt. I.B.3, *ante*). Because the evidence is as consistent with permissible competition as with illegal conspiracy, the evidence is insufficient to support the alleged antitrust conspiracy. (*Aguilar, supra*, 25 Cal.4th at p. 852.)

In the end, as *Aguilar* states, the proposition is simple. If a party moving for summary judgment "would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment." (*Aguilar, supra*, 25 Cal.4th at p. 855.) That occurred in the Texas trial, and the same result obtains here.

---

[37] As *Aguilar* noted, " '[a]ssessing the sufficiency of the evidence to determine whether a reasonable juror could find that the plaintiff has satisfied his burden of persuasion' " is a traditional judicial function. (*Aguilar, supra*, 25 Cal.4th at p. 856, fn. 26, quoting 2 Areeda and Hovenkamp, Antitrust Law (rev. ed. 1995) ¶ 322, p. 71.)

D. *The evidence Eddins cites to establish a series of vertical conspiracies between Blockbuster and each studio is the same evidence Eddins presented on the horizontal conspiracy claim, and is similarly deficient.*

Eddins contends that the trial court ignored the question of vertical conspiracies, that is, whether the evidence supports a reasonable inference that any studio reached an understanding with Blockbuster—as opposed to among themselves—to deny independent retailers access to Blockbuster's favored terms. However, Eddins cites the same evidence previously discussed, none of which tends to exclude the possibility that each studio acted independently in its pricing decisions. The only evidence even suggestive of a vertical agreement is the evidence, described in part I.B.3.a, *ante*, that Blockbuster asked Fox for exclusivity and Fox refused. One cannot reasonably infer from this evidence an agreement between Blockbuster and Fox, much less a vertical agreement between Blockbuster and any other studio. Eddins again cites *Alakayak, supra*, 48 P.3d 432, this time for the proposition that "evidence of both an invitation to collude, as well as acceptance of that invitation," satisfies the requirement for evidence that tends to exclude the possibility of independent action. (*Alakayak, supra*, 48 P.3d at pp. 452, 458.) In *Alakayak*, however, evidence existed on both points. *Alakayak* involved a conspiracy by salmon processors and importers to depress the prices paid to commercial salmon fishers. Documentary evidence showed that one of the defendants suggested mutual cooperation on establishing reasonable pricing, and evidence indicated that various other defendants accepted that invitation by setting a low initial price, agreeing on an initial price at a meeting, and applying pressure on nonparty processors and importers to lower their prices. (*Id.* at pp. 457–458.) In this case, by contrast, comparable evidence, from which one could reasonably infer that any studio accepted Blockbuster's "invitation to collude," is absent. (See *In re Citric Acid Litigation, supra*, 191 F.3d at p. 1098 ["[i]t would not be reasonable to infer that [defendant] engaged in illegal activities merely from evidence that an illegal course of action was suggested but immediately rejected"].) Accordingly, Eddins's theory of a vertical conspiracy between Blockbuster and each of the studios meets the same fate as the claim of a horizontal conspiracy among the studios.

In sum, we conclude, as have the three other courts which examined substantially the same evidence, that none of it "tends to exclude . . . the possibility that the [studios] acted independently" when they did not offer distributors the same output revenue-sharing terms they extended to Blockbuster. (*Aguilar, supra*, 25 Cal.4th at p. 852.) Accordingly, summary adjudication was proper on the Cartwright Act claim.

II. *Summary judgment was improper on Eddins's Unfair Practices Act claim, except with regard to transactions between Paramount and Blockbuster.*

We conclude in part I, *ante,* that insufficient evidence exists to infer a conspiracy among the studios or with Blockbuster to withhold Blockbuster-comparable output revenue-sharing terms from distributors for independents. The question whether each defendant's conduct may have violated Business and Professions Code section 17045, however, is entirely different.

The Unfair Practices Act (UPA) declares unlawful both the secret payment of rebates or unearned discounts and the secret extension of special services or privileges not extended to all purchasers on like terms and conditions. Specifically: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful." (Bus. & Prof. Code, § 17045.) Eddins contends the studios, by failing to offer Blockbuster-comparable terms to distributors, secretly allowed Blockbuster unearned discounts. The trial court granted summary judgment on the UPA claim, on grounds that plaintiffs' distributors and Blockbuster did not purchase on "like terms and conditions"; the distributors and Blockbuster were in different functional classes; and the Blockbuster terms were not "secret."

With one exception—transactions between sister companies Paramount and Blockbuster—we conclude that the trial court erred in granting summary judgment on Eddins's UPA claim. We also reject Blockbuster's contention that it is entitled to summary judgment based on Eddins's failure to offer evidence that Blockbuster knowingly solicited or effectuated violations of the UPA. We address in turn each of the statutory bases upon which the trial court relied.

A. *The "like terms and conditions" issue: A plaintiff need not purchase upon "like terms and conditions" in order to state a claim that a competitor has received a secret rebate or unearned discount.*

The trial court concluded that (1) the independent retailers (through their distributors) must purchase "upon like terms and conditions" in order to state an actionable claim that a studio has given a secret, unearned discount to Blockbuster, and (2) Blockbuster and the distributors purchased "upon fundamentally different terms and conditions," so that Eddins's Business and

Professions Code, section 17045 claim failed. The court was correct as to the second point. Blockbuster agreed to purchase the full output of the studios under multiyear contracts, before Blockbuster knew the titles that the studios would release, and before it knew the performance of those titles at the box office. The distributors, on the other hand, purchased videos title by title, after they and their customers, the independent retailers, knew the title's performance at the box office. These transactions are very different. Accordingly, a purchaser using one of them ordinarily cannot complain of price discrimination if it chooses to purchase on different terms.

If, however, a purchaser has no choice but to purchase "upon fundamentally different terms and conditions," because the terms given to the favored purchaser are neither available to nor known by the disfavored purchaser, it is difficult not to conclude that some form of price discrimination may have occurred.[38] Indeed, this possibility reinforces the conclusion, confirmed as well by the plain language of Business and Professions Code, section 17045 and by case precedent, that the "like terms and conditions" requirement of section 17045 does not apply to the first clause of that section. In other words, it is not necessary to purchase "upon like terms and conditions" in order to state a claim that a competitor received a secret rebate or unearned discount. If a supplier were free to give secret rebates or unearned discounts to customers purchasing under plan A, unbeknownst to customers purchasing under significantly different plan B, the very purpose of the prohibition on price discrimination would be undermined: "[A] producer from whom a large retailer has extracted special concessions might well prefer to keep such concessions secret. Section 17045 is thus tailored to address the problem of a manufacturer or other producer who is forced or induced to give preferential prices to one or more individual purchasers, typically retailers. This practice, of course, is likely to be injurious to the disfavored buyers' business position and may tend to destroy competition among such buyers." (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1267 [61 Cal.Rptr.2d 112, 931 P.2d 290], italics omitted (*ABC Internat. Traders*).)

The studios contend that "[a] long line of California authority" has interpreted Business and Professions Code section 17045 to require the plaintiff to purchase "upon like terms and conditions" in order to challenge a secret rebate or discount. In fact, the only court which expressly addressed the question reached the opposite conclusion. (*Diesel Electric Sales & Service, Inc. v. Marco Marine San Diego, Inc.* (1993) 16 Cal.App.4th 202, 216, fn. 5 [20 Cal.Rptr.2d 62] (*Diesel Electric*).) In *Diesel Electric*, the supplier told Diesel that it was extending to Diesel's competitor Marco

---

[38] Of course, it may well be that, if the same terms and conditions were offered to distributors, they would not have been accepted. However, that is not the question before us.

exactly the same pricing it offered Diesel. However, the supplier failed to inform Diesel that Marco was receiving the maximum volume discount, even though it did not order a sufficient volume to qualify for such a discount. (*Id.* at pp. 208–209.) The trial court concluded, among other things, that Diesel and Marco were not purchasing upon like terms and conditions, apparently because Marco was affiliated with an original equipment manufacturer (OEM), and Diesel was a distributor. (*Id.* at p. 216.) The Court of Appeal disagreed. After concluding Marco was a distributor, not an OEM, the court noted that both the trial court and Marco "appear to have assumed the phrase 'purchasing upon like terms and conditions' contained in the language of section 17045 applies to secret allowances of unearned discounts." (16 Cal.App.4th at p. 216, fn. 5.) The court continued: "Since section 17002 requires us to liberally construe section 17045 to serve its purposes, we conclude the phrase 'purchasing upon like terms and conditions' does not apply to or otherwise qualify secret allowances of unearned discounts. Rather, the proper reading of that phrase and the entirety of section 17045 results in its application only to secret extensions of 'special services or privileges not extended to all purchasers' who are 'purchasing upon like terms and conditions.' " (*Ibid.*)

 The studios say there is "ample authority to the contrary that squarely refutes the *Diesel Electric* court's erroneous belief as to the scope of Business and Professions Code, section 17045's limitation." The studios are mis taken. The first case cited is *Harris v. Capitol Records Etc. Corp.* (1966) 64 Cal.2d 454 [50 Cal.Rptr. 539, 413 P.2d 139] (*Harris*). In *Harris*, the plaintiff challenged a record distributor's sale to him at one price, and a sale to his competitor (Dale) at another, as an unlawful "locality discrimination" under Business and Professions Code, sections 17031 and 17040, not as a secret rebate. The Supreme Court rejected Harris's claims under those statutory provisions. Harris also tried to prove that Dale sold at less than cost, in violation of section 17043, and that the distributor colluded with Dale in the sale at less than cost, in violation of section 17048. As evidence that the distributor knew about and participated in Dale's sales at retail, Harris relied on the distributor's grant of an advertising allowance for the purpose of defraying the cost of advertising its own brand of record. The court stated that "advertising allowances are special benefits that would fall, if at all, under the terms of section 17045 . . . ." (*Harris, supra,* 64 Cal.2d at p. 463.) After quoting the section, the court continued: "The section is inapplicable here for two reasons: first, the allowance was not secret, and each defendant's trademark appeared on the face of the advertisement; and second, such allowances were not discriminatory but were 'extended to all purchasers purchasing upon like terms and conditions,' as permitted by section 17045." (*Harris, supra,* 64 Cal.2d at p. 463.) The studios contend that, by this language, the court interpreted the "like terms and conditions" clause to apply to the secret allowance of unearned discounts (the first clause) as well

as to the secret extension of special services or privileges (the second clause). The court, however, clearly stated the "advertising allowances" in question were "special benefits." These allowances fall more readily within the second clause of the statute ("special services or privileges") than within the first ("rebates, refunds, commissions, or unearned discounts"). In any event, the court had no occasion to and did not purport to address the issue raised in this case. The other cases the studios cite likewise are not apropos, as they do not directly address the question at issue.[39] As has been frequently stated, it is well established that an opinion is authority only for the issues actually considered and decided. (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1076 [135 Cal.Rptr.2d 361, 70 P.3d 351].)

Finally, the studios protest that Eddins's argument—that the studios refused to offer distributors the Blockbuster terms—shows Eddins's "real complaint is an alleged refusal to deal." A refusal to deal, they contend, is not within the scope of Business and Professions Code, section 17045. While the latter contention is correct, the former is not. The studios did not "absolutely" refuse to deal with the distributors; they allegedly refused to offer the same terms. (*L & L Oil Co., Inc. v. Murphy Oil Corp.* (5th Cir. 1982) 674 F.2d 1113, 1121 [under the Robinson-Patman Act, "a supplier may refuse to deal absolutely with any customer, but once it decides to deal, it must do so evenly among all its customers as to price"].) We conclude, therefore, based on precedent (*Diesel Electric*), a plain reading of Business and Professions Code, section 17045, and the legislative directive that the UPA must be

---

[39] In *ABC Internat. Traders, supra,* 14 Cal.4th at page 1264, the Supreme Court merely repeated its holding in *Harris, supra,* stating that: "We held [in *Harris*] section 17045 did not apply to advertising allowances allegedly granted to the competing retailer, because the allowances were neither secret nor discriminatory, being available to all purchasers buying on like terms and conditions." (*ABC Internat. Traders, supra,* 14 Cal.4th at p. 1264.) The court did not address the question whether advertising allowances were "rebates, refunds, commissions, or unearned discounts" (clause one) or "special services or privileges" (clause two). In *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256 [195 Cal.Rptr. 211] (*G.H.I.I.*), the court rejected as specious the defendants' argument that plaintiffs "failed to plead that the 'secret rebates' were 'not extended to all purchasers purchasing upon like terms and conditions' . . . as section 17045 requires." (*Id.* at p. 272, italics omitted.) The court observed the gravamen of plaintiffs' complaint was that they purchased on like terms and conditions, but were treated differently by distributors. Again, the court merely responded to an argument, and did not address the question whether "like terms and conditions" modifies the rebate clause. Moreover, the court pointed out that the plaintiffs alleged the existence of both secret prices and discounts and "financing arrangements and other special terms and services specified in the complaint which were not granted to" plaintiffs (*id.* at p. 264), thus implicating both clauses of the statute. Finally, in *Uneedus v. California Shoppers, Inc.* (1978) 86 Cal.App.3d 932, 937 [150 Cal.Rptr. 596], the court made the general observation that the UPA "closely parallels the Robinson-Patman Act," and that both proscribe three basic types of business practice: price discrimination in its various forms; sales below cost; and "the granting of rebates and discounts not made available to all buyers on like terms and conditions," citing a law review article on the UPA. Again, the court had no occasion to address the question raised in this case.

liberally construed (Bus. & Prof. Code, § 17002; see *ABC Internat. Traders, supra*, 14 Cal.4th at p. 1256), that the trial court erred in concluding that purchasing on "like terms and conditions" was required to state a claim that the studios gave a secret, unearned discount to Blockbuster.

B. *The secrecy issue: Evidence that the "general parameters" of Blockbuster's agreements were reported in the media does not establish, as a matter of law, that the secrecy requirement of section 17045 was not met, because other evidence indicated that key economic points were not known to the public.*

Business and Professions Code, section 17045 prohibits only the "secret" payment of unearned discounts. In describing the legal and economic concerns motivating the passage of the UPA, *ABC Internat. Traders* explained that "preferential rebates and unearned discounts were typically not disclosed publicly or to the trade generally. To the contrary, these discounts—or their unearned character—were frequently kept secret so that the buyer's competitors would not demand the same treatment." (*ABC Internat. Traders, supra*, 14 Cal.4th at p. 1259.)

In this case, the trial court held that the secrecy requirement was not met. It apparently accepted the defendants' contention and evidence that "the existence, basic concepts and chief economic terms of Blockbuster's agreements with the studios were not secret . . . and the existence and essential terms of the agreements were broadly publicized in trade and business publications . . . ." The court concluded that "where the essential terms are known to the plaintiffs and the public, the essential secrecy element of a section 17045 claim is not established."

We do not quarrel with the principle that if the essential terms of a rebate or unearned discount are known to the plaintiffs and the public, the secrecy element cannot be met. We do, however, question the conclusion that the evidence showed, as a matter of law, that the "essential terms" were known, either to the plaintiffs or to the general public. The evidence the studios contend established this point beyond dispute consists of the declarations of John Antioco, Eric Doctorow, Robin Russell and Pat Wyatt, and four articles that appeared in the media. The declarations merely assert that Blockbuster's revenue-sharing agreement negotiations were widely reported in the press, and Fox's Wyatt attaches a Forbes article reporting "some of the key terms of the [Disney] deal, . . . includ[ing] a quote from Sumner Redstone that gave the general parameters of Blockbuster's revenue sharing agreements with the other studios." Of the four press reports cited, only the June 1998 *Forbes* article contained any "key terms" other than the significant

reduction in price. It stated: "[T]he Disney deal works like this: Blockbuster buys videotapes from Disney at about $7 to $8 each—just a bit more than a tenth of the old price. But Disney gets about 40% of the rental revenue in addition. After about 26 weeks Disney's share of the revenue stream dwindles, and when business trickles off, Blockbuster can sell the used tapes, largely recouping its original capital outlay. [¶] Negotiations with the other studios yielded variations on this theme. 'Today, roughly speaking, we pay zero to $7 a tape. The studios get between 30% and 40% of the revenues,' says Redstone. 'But now, instead of stocking only 30 tapes of a hit movie in each store, we're stocking 100.' "

In short, it was publicly known that the Blockbuster revenue-sharing deals gave Blockbuster copy depth, a price of between $0 and $7 per tape, and 60 percent of the revenue. If those are the only "essential terms," the deals were not secret. However, Eddins cites evidence from Paramount that the economics of a revenue-sharing deal are driven by "six key economic points," including: guarantee, fee, splits, PVT [provisions on the sale of previously viewed tapes], minimum pricing, and the grid [the matrix determining the number of copies required to be purchased]. Columbia's list of key revenue share deal terms is similar. Doctorow testified that, in evaluating the economics of a revenue-sharing deal, "you cannot pick individual elements and look at them apart from the entire package," and "these deals have a variety of components and as you move any one of the components, the entire financial structure of the deal can be very different." With respect to plaintiff Webb's request for a direct deal on behalf of the 400 members of the IVRG, Columbia's Russell testified that "there was no way they would have known what my Blockbuster deal was. I had no idea what Warner's Blockbuster deal was." Ingram testified that he "ha[d] no idea" whether the deal he had with Disney was at all comparable to the deal Disney had with Blockbuster. Rentrak's Graham testified that he did not know the terms of Blockbuster's agreements with each of the studios. Indeed, the terms of those deals are subject to a protective order and filed under seal in this court. Under these circumstances, we are compelled to conclude that a factual question exists on the secrecy issue, and the trial court erred in concluding otherwise.

> C. *The functional classification issue: The fact that Blockbuster is a retailer and the distributors are wholesalers does not entitle the studios to sell to Blockbuster at a more favorable price, because Blockbuster does not perform any function or incur any risk or cost to justify a difference in price.*

The UPA does not prohibit a supplier's functional classification of any customer as "broker, jobber, wholesaler or retailer," and does not prohibit a differential in price for any product "as between any customers in different

functional classifications." (Bus. & Prof. Code, § 17042, subds. (b) & (c).) The studios contend this provision bars Eddins's claim, because Blockbuster is a retailer, and the studios are entitled to differentiate between the price to retailers and the price to distributors. The trial court agreed, concluding that the distributors and Blockbuster carry on fundamentally different businesses, Blockbuster as a video retailer and the distributors as video wholesalers. While the studios' contention, and the trial court's conclusion, is superficially appealing, it cannot withstand analysis.

■ The theory underlying the functional classification defense, entitling the seller to sell at different prices to buyers in different classifications, is that the buyer in the favored classification performs some function, and assumes the risks and costs of that function, that would otherwise be incurred by the seller. An example of the theory underlying the functional classification defense appears in *Harris, supra,* 64 Cal.2d 454. In *Harris,* the Supreme Court held that a pricing structure in which a distributor sells records to a retailer at one discount and to a rack-jobber at another is expressly permitted by Business and Professions Code section 17042. (*Harris,* at p. 463.) The court observed that the rack-jobber—a subdistributor who purchases records and places them in self-service racks at retail outlets—was given "the standard 38 percent dealer discount" given to all record retailers, plus an additional 10 percent off the remaining cost "because of his extra expenses in supplying and servicing the racks." (*Id.* at p. 457.) In other words, a buyer may receive a functional discount, which has been defined as a discount " 'given to a purchaser based on its role in the supplier's distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier.' " (*Texaco, Inc. v. Hasbrouck* (1990) 496 U.S. 543, 554–555, fn. 11 [110 L.Ed.2d 492, 110 S.Ct. 2535] (*Hasbrouck*) [adopting definition proposed by the United States and the FTC as amici curiae].) Thus, the mere fact that one buyer is a wholesaler and one buyer is a retailer does not give the seller free rein to give a functional discount "completely untethered to either the supplier's savings or the wholesaler's costs." (*Id.* at p. 563; see 14 Hovenkamp, Antitrust Law (2002), ch. 23, ¶ 2333b2 [referring to *Hasbrouck*'s rejection of the argument that price discriminations as between wholesalers and retailers should be excluded from the Robinson-Patman Act].) In California, these principles are reflected in the Judicial Council's civil jury instructions on functional classifications as a defense to secret rebates.[40]

---

[40] The jury instructions state that, to succeed with an affirmative defense that secret rebates are lawful because they apply to different classes of customers, the defendant must prove (1) that defendant "created different classes of customers," such as wholesaler/retailer; (2) that "customers in the different classes performed different functions and assumed the risk, investment, and costs involved;" (3) that the difference in the rebate or discount "was given only in those sales where the favored buyer performed the function on which the claim of a

In this case, the fact that Blockbuster is a retailer and the distributors are wholesalers does not entitle Blockbuster to a functional discount, as the studios have identified no function or service Blockbuster performs and the distributors do not. In the ordinary case, it is the distributor, not the retailer, that receives a discount from the supplier, because the distributor performs services for the supplier in getting the supplier's product to the retailers, and is entitled to compensation for that service. Thus, providing a functional discount to Blockbuster because it is a retailer rather than a wholesaler literally turns the UPA, and the concept of price discrimination, on its head. (See *Diesel Electric, supra*, 16 Cal.App.4th at p. 217 [citing the *Hasbrouck* principle that a buyer should legally qualify for a functional discount only to the extent the buyer actually performs certain functions, assuming all the risk, investment and costs involved].) The trial court therefore erred when it granted summary judgment on Eddins's Business and Professions Code section 17045 claim on this basis.

> D. *The "meeting competition" defense: The trial court failed to consider the evidence of harm to competition in the secondary line of commerce, between Blockbuster and its competitors, and therefore erred in finding Fox and Columbia established a "meeting competition" defense to Eddins's section 17045 claim.*

Fox, Columbia and Universal also sought summary judgment on Eddins's UPA claim on the ground that they entered into a revenue-sharing agreement with Blockbuster to meet competition of the other studios. Meeting the competition of the other studios, they contended, negated the element of harm to competition under Business and Professions Code, section 17045, which makes secret, unearned discounts unlawful where the discount is "to the injury of a competitor and where such payment or allowance tends to destroy competition . . . ." (Bus. & Prof. Code, § 17045.) The trial court held that meeting competition was "a complete defense judicially recognized as defeating the prima facie element of 'harm to competition' required in section 17045 claims," citing *E&H Wholesale, Inc. v. Glaser Bros.* (1984) 158 Cal.App.3d 728, 738–739 [204 Cal.Rptr. 838] (*E&H Wholesale*), and *Diesel Electric, supra*, 16 Cal.App.4th at page 218. According to the trial court, Fox and Columbia established that defense because the evidence showed they "determined that they must enter into revenue-sharing agreements with Blockbuster in order to remain competitive."

---

different class is based;" and (4) that "the difference in price was reasonably related to the value of such function." (CACI No. 3332.)

 The trial court misconstrued *E&H Wholesale* and *Diesel Electric*. Those cases do not stand for the proposition that meeting competition, as a matter of law, defeats the element of Business and Professions Code, section 17045 requiring the unearned discount to have a tendency to destroy competition. Indeed, *Diesel Electric* expressly states that "there exists no 'meeting competition' defense to a section 17045 violation . . . ." (*Diesel Electric, supra,* 16 Cal.App.4th at p. 218.) As the court explained, the UPA explicitly provides a "meeting competition" defense to certain violations, specifically, to locality discriminations, sales below cost, and loss leaders. (*Id.* at p. 217; Bus & Prof. Code, §§ 17040 & 17050.) The court correctly inferred that the Legislature's omission of any reference to that defense in section 17045 showed no such defense was available. *Diesel Electric* went on to observe that "in certain situations the meeting of a competitor's pricing may disprove the existence of one of the elements of a section 17045 violation," and that "it is possible the element of a tendency to destroy competition may not exist if there is merely a legitimate meeting of a competitor's pricing." (*Diesel Electric, supra,* 16 Cal.App.4th at p. 218.) On the evidence in *Diesel Electric,* the court concluded that "such an argument is not available . . . ." (*Ibid.*)

The fact that meeting a competitor's prices "may disprove" a tendency to destroy competition "in certain situations" does not mean that it does so in all cases. (*Diesel Electric, supra,* 16 Cal.App.4th at p. 218.) For example, the allegation in this case is that the secret, unearned discount to Blockbuster had a tendency to destroy competition in the "secondary" line of commerce (between Blockbuster and other purchasers of videos), not in the "primary" line (among the studios as sellers of videos). Unless meeting competition is an absolute defense under the statute—and it is not—the question whether the secret rebate or discount has a tendency to destroy competition is a factual question that cannot be decided without regard to the evidence of harm to competition in the secondary line of commerce. (See *ABC Internat. Traders, supra,* 14 Cal.4th at pp. 1261–1262 [establishing the principle that the competition protected under Business and Professions Code, section 17045 is not restricted to competitors of the person allowing an unearned discount, but also includes competitors of the person receiving the unearned discount; section 17045 "was intended primarily to protect against competitive injury in the secondary line of commerce, i.e. at the level of the discount's recipient"].) The trial court, however, overlooked the evidence of harm to competition in the secondary line of commerce. It considered only the evidence that Fox and Columbia were meeting competition from the other studios, and failed entirely to consider the evidence of competitive injury in the secondary line

of commerce between Blockbuster and its competitors. Summary judgment was therefore inappropriate.[41]

 The studios protest that, under the Robinson-Patman Act, meeting competition is an absolute defense, as a prima facie case of price discrimination may be rebutted "by showing that [the seller's] lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." (15 U.S.C. § 13 (b).) The point is correct, but irrelevant, because the UPA contains no such provision. While the UPA "closely parallels the Robinson-Patman Act, and is based upon the same policy considerations" (*G.H.I.I., supra*, 147 Cal.App.3d at p. 271), it is not the same. For example, the Supreme Court has pointed out that Business and Professions Code section 17045 requires the plaintiff to prove not only injury to a competitor, but, in addition, a tendency to destroy competition, whereas the Robinson-Patman Act has disjunctive language, and has been interpreted as including discrimination that causes injury only to a particular competitor. (*ABC Internat. Traders, supra*, 14 Cal.4th at p. 1262.) The court continued: "Thus, whatever may be the federal law or enforcement pattern, section 17045 applies only when the discriminatory rebate, discount or allowance has a tendency to destroy competition generally." (*Ibid.*, italics omitted.) In short, the UPA is not a clone of the Robinson-Patman Act, and we cannot apply a "meeting competition" defense that does not exist under the UPA merely because the Robinson-Patman Act provides the defense.

 In short, the Legislature specified the applicability of the meeting competition defense for some UPA violations—such as locality discriminations and sales below cost—and not for others, such as the secret rebates and unearned discounts forbidden by Business and Professions Code, section 17045. It is not this court's province to import into the law provisions the Legislature did not see fit to include. Careful adherence to the statutory scheme is particularly appropriate in this case, in light of the Supreme

---

[41] *E&H Wholesale, supra*, 158 Cal.App.3d 728, does not hold to the contrary. *E&H Wholesale* involved a suit by a wholesale distributor of cigarettes against two other wholesale distributors, alleging defendants gave secret rebates to selected customers, with the result that customers began purchasing from defendants rather than plaintiff. (*Id.* at pp. 730–732.) The court concluded the evidence did not support a finding that the secret rebates or discounts tended to destroy competition. Defendants gave the discounts to certain customers because the customers advised defendants of competitive offers from other distributors—in one case, from plaintiff—and the defendants met but did not exceed those offers. (*Id.* at pp. 738–739.) As the court concluded, "it is clear that discounts offered by [defendant to two customers] tended not to destroy competition, but rather, to meet the demands thereof, for in each instance, the discount was granted in order to meet offers made by competitors." (*Id.* at p. 739.) The case does not involve any allegation of injury to competition in the secondary line of commerce (among the customers receiving the discount), but only in the primary line of commerce (between plaintiff and the defendants giving the discount).

Court's view that section 17045 was intended "primarily" to protect against competitive injury "in the secondary line of commerce, i.e. at the level of the discount's recipient."[42] (*ABC Internat. Traders, supra,* 14 Cal.4th at p. 1262.) Accordingly, the trial court's conclusion that meeting competition was a "complete defense" to a section 17045 claim was erroneous.

> E. *The intra-enterprise transaction defense: Because Paramount and Blockbuster are commonly controlled companies, they are part of a single economic enterprise, and transactions between them cannot form the basis for liability under section 17045.*

The trial court also held that no liability can be imposed for price discrimination claims for transactions between Blockbuster and Paramount, because both are controlled by Viacom and transactions between commonly controlled companies cannot form the basis for a price discrimination claim. On this point we agree with the trial court.

At all relevant times, Viacom owned 100 percent of Paramount's voting stock. Viacom also owned 100 percent of Blockbuster's voting stock until August 1999, when it sold four percent of Blockbuster's voting power in an initial public offering. It retained voting power over approximately 96 percent of Blockbuster's stock. While no California precedent addresses the issue of liability under the UPA for transactions between commonly controlled companies, ample precedent exists under the Robinson-Patman Act, as well as analogous precedent under the Sherman Act. In accordance with those precedents, we conclude Paramount cannot be liable for the allowance of secret unearned discounts or the extension of special services or privileges to Blockbuster.

The precedents under the Robinson-Patman Act are clear and find authority for their conclusions in the United States Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.* (1984) 467 U.S. 752 [81 L.Ed.2d 628, 104 S.Ct. 2731] (*Copperweld*). In *Copperweld*, the Court held that a wholly owned subsidiary could not conspire with its parent under the Sherman Act, because the two have "a complete unity of interest" and "share a common purpose whether or not the parent keeps a tight rein over the subsidiary . . . ." (*Id.* at p. 771.) The Court observed that a corporation has "complete power" to maintain a portion of the enterprise either in the form of

---

[42] See also CACI No. 3333 [jury instruction on meeting competition as an affirmative defense to locality discrimination, below cost sales and loss leader sales claims]. No such instruction exists with respect to secret rebates.

an unincorporated division or a separately incorporated subsidiary, and that the "economic, legal, or other considerations" driving the choice of structure "are not relevant to whether the enterprise's conduct seriously threatens competition." (*Id.* at p. 772.)

Since the 1970's, courts have reached similar conclusions in price discrimination claims under the Robinson-Patman Act. (See, e.g., *Security Tire & Rubber Co. v. Gates Rubber Co.* (5th Cir. 1979) 598 F.2d 962, 967 ["a parent corporation's transfers to its wholly-owned subsidiary may not be considered separate sales to a favored customer in a Robinson-Patman Act price discrimination suit"]; *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.* (8th Cir. 1988) 838 F.2d 268, 270, 278–279 [a group of related corporations which comprised part of a rural electric cooperative constituted a single enterprise; the intra-enterprise transfers between the cooperatives could not provide a basis for liability under the Robinson-Patman Act]; see *Brown v. Hansen Publications, Inc.* (9th Cir. 1977) 556 F.2d 969, 972 [publisher which made its sheet music and books available to commonly controlled distribution company, on more favorable terms than to the distributor's competitors, was not liable under the Robinson-Patman Act; both companies were "parts of a single integrated enterprise and . . . transfers between them were indistinguishable from dealings within the same corporate entity"].)

Analogously, in *Caribe BMW v. Bayerische Motoren Werke* (1st Cir. 1994) 19 F.3d 745, 747, 750 (*Caribe BMW*), the court held that a firm's wholly owned subsidiary and the firm itself amounted to a single seller under the Robinson-Patman Act, finding "nothing special in the Robinson-Patman Act context that militates against *Copperweld*'s reasoning or result." The court rejected the notion, suggested by Eddins, that courts should examine whether commonly-controlled corporations actually conduct their business and pricing decisions independently: "Given the strength of that joint economic interest [between parent and wholly owned subsidiary], we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective. Those instances in which a wholly owned subsidiary would intend to act contrary to the economic interests of its owner are likely few and far between, and, if they ever exist, would seem hard to prove." (*Caribe BMW, supra*, 19 F.3d at p. 750.) *Caribe BMW* cited *Mt. Pleasant* and *Security Tire*, observing that: "A majority of courts, using a *Copperweld*-type analysis, have held that a firm M's sale of a good to a wholly owned subsidiary D is not a 'sale' for Robinson-Patman Act purposes;

rather, it is simply a transfer; and that is so whether D is, or D is not, somehow 'independent' in reality. [Citations.] These holdings mean that D, the transferee, is not a 'purchaser' from M, and, for that reason, M does not violate the Act even if he sells the same good to a direct buying retailer . . . or even a direct competitor of D, at a higher price than the price at which he 'transfers' the good to D." (*Caribe BMW, supra*, 19 F.3d at pp. 750–751.)

Eddins contends that *Diesel Electric, supra*, 16 Cal.App.4th at page 216, is authority for treating sibling companies as separate entities for purposes of UPA liability. We disagree, because *Diesel Electric* did not involve intra-company transactions. In *Diesel Electric*, the court observed that defendant Marco San Diego (a distributor) and its sibling company (an original equipment manufacturer which was not a party to the lawsuit) "should be treated as separate entities for purposes of pricing and section 17045 viola-tions." (*Ibid.*) Specifically, the court held that Marco San Diego was not allowed "to create an illusion that it is part of its sister company, Marco Seattle, and obtain favorable discriminatory prices which other distributors in competition with it cannot obtain." (*Ibid.*) *Diesel Electric* is not on point, as it did not involve a sale, purchase or transfer between sibling companies. *Diesel Electric* merely concluded, correctly, that Marco San Diego could not avoid liability under the UPA for receiving a secret, unearned discount from an unrelated third party merely because its sibling company (which was a manufacturer, not a distributor) was entitled to a manufacturer's discount. The case is entirely inapposite to the issue of UPA liability for transactions between commonly controlled companies.

 In sum, in the absence of statutory or case authority to the contrary, we perceive no cogent reason why the principles applied in *Copperweld*, *Caribe BMW, Mt. Pleasant* and *Security Tire* should not also be applied under the UPA, which "closely parallels the Robinson-Patman Act, and is based upon the same policy considerations . . . ." (*G.H.I.I., supra*, 147 Cal.App.3d at p. 271.) Accordingly, the trial court correctly concluded that no liability could be imposed under Business and Professions Code, section 17045 with respect to transactions among Viacom, Blockbuster and Paramount.

> F. *Blockbuster's liability for soliciting a violation of section 17045: Blockbuster is not entitled to summary judgment based on lack of evidence of knowing solicitation of a secret unearned discount, because it did not seek summary judgment on that ground.*

Blockbuster contends that, even if triable issues exist as to whether the studios violated the UPA, Eddins did not present evidence that Blockbuster

knowingly solicited or effectuated the studios' violation of the UPA. As a result, Blockbuster is entitled to summary judgment. The short answer to this claim is that Blockbuster did not seek summary judgment on this ground. The defendants' separate statement cited no evidence, and Blockbuster made no argument, on the point. Accordingly, the claim that the plaintiffs "have not carried their burden of presenting additional evidence that Blockbuster knowingly solicited or effectuated" the studios' UPA violations is without merit.[43] A plaintiff has no burden to produce evidence to prevent summary judgment when the moving defendant has produced none. (See *Aguilar, supra*, 25 Cal.4th at p. 850.)

III. *Because summary judgment was erroneous on Eddins's Unfair Practices Act claim, it was also erroneous on the cause of action for violation of the unfair competition law.*

█ The unfair competition law (UCL), codified in sections 17200 et seq. of the Business and Professions Code, defines unfair competition to include "any unlawful, unfair or fraudulent business act or practice" (Bus. & Prof. Code, § 17200), and governs anticompetitive business practices as well as injuries to consumers. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) After granting summary judgment on Eddins's other claims, the trial court concluded the UCL cause of action also was barred under *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375 [113 Cal.Rptr.2d 175] ["conduct alleged to be 'unfair' because it unreasonably restrains competition and harms consumer . . . is not 'unfair' if the conduct is deemed reasonable and condoned under the antitrust laws"]. While the court's conclusion was correct with respect to conduct alleged to violate the Cartwright Act, we have concluded that summary judgment was improper on Eddins's claim that the studios and Blockbuster violated the Unfair Practices Act. █ Accordingly, since the defendants' conduct may be unlawful under the Unfair Practices Act, it necessarily follows that summary judgment on the UCL claim was also erroneous. (*Cel-Tech, supra*, 20 Cal.4th at p. 180 [by proscribing any unlawful business practice, the UCL borrows violations of other laws and treats them as unlawful practices independently actionable under the UCL].)

---

[43] We express no opinion on whether evidence of a "knowing" inducement of an unearned discount is required to establish a violation of Business and Professions Code, section 17045 by the recipient.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The cause is remanded to the trial court with directions to vacate its order granting summary judgment, and to enter a new and different order (1) granting summary adjudication to the defendants of the cause of action for violation of the Cartwright Act, and (2) denying summary adjudication on the causes of action for violation of the Unfair Practices Act and the unfair competition law, except with respect to transactions between Blockbuster and Paramount, as to which summary adjudication is properly granted. The parties are to bear their own costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 8, 2006, S140070. George, C. J., and Chin, J., did not participate therein.